## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ZENSAR TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PAREXEL INTERNATIONAL LLC | ) | Case No. |
| | ) | |
| Defendant. | ) | |
| ------------------------------------------------- | ) | |

## COMPLAINT

Plaintiff, Zensar Technologies Ltd., (a/k/a Zensar Technologies, Inc.) by its counsel asserts the following with respect to Parexel International, LLC.

## PARTIES

1.      Zensar Technologies, Inc., ("Zensar") is a California corporation with its headquarters in Oakbrook, Illinois.

2.      Parexel International, LLC ("Parexel") is a Delaware limited liability company with its principal offices in Waltham, Massachusetts.   Upon information and belief, all of Parexel's members are citizens solely of Massachusetts.

## JURISDICTION AND VENUE

3.      Zensar's claim arises under common law breach of contract principles and there is a contract between the parties expressly requiring the application of Massachusetts law.

4.     This matter is properly before this Court pursuant to 28 U.S.C. Section 1332(a) as there is complete diversity of citizenship between the parties and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

5.     The actions and/or omissions complained of in this Complaint occurred and the Defendant is located within this judicial district.  Accordingly, venue is appropriate pursuant to Section 28 U.S.C. Section 1391(a).

## FACTS GIVING RISE TO CLAIM

6.     Zensar is a global technology services company, that in part, provides software application support and development, application management, testing enterprise collaboration, contact management, enterprise application integration and other software design and implementation processes.

7.     Parexel provides national and international services for companies in the pharmaceutical, biotechnology and medical device industries.

8.     On or about June 27, 2008, Parexel entered into a Master Services Agreement ("MSA") with Zensar, for Zensar to provide certain services and deliverables further described in one or more written Statements of Work ("SOWs").  (See MSA attached hereto as Exhibit A along with SOW attached as Exhibit B hereto.[1])

9.     The overall services and deliverables at issue relate to the implementation of certain third party software used with respect to a large global database, automation of certain

---

[1] Any sections of Exhibit B or later Exhibits referred to herein have been redacted to remove any references to file names or other matters that could arguably be considered confidential.

contracts and automation of billing clients of Parexel (the "Project").[2]  The Project was to have an initial term of at least twenty-four (24) months.  While the Project was initially based on time and materials, the total fees for the Project were originally estimated to be approximately $4,083,524.00[3] predicated upon an estimate of over 40,000 of man hours required by Zensar's employees.  (See Ex. B, pg. 29 of 39.)

**Relevant MSA Provisions**

10.     The MSA provides that the neither it nor the associated SOWs could be modified except by writings by the parties. (See Ex. A, pars. 1(a) and 13(e).)

11.     Parexel was further to "pay undisputed charges within forty-five (45) days of Parexel's receipt of a correct invoice.  (Id. at par. 10(b).)

12.     Any disputes arising under the MSA were expressly agreed to be adjudicated and interpreted in accordance with the laws of the Commonwealth of Massachusetts without regard to any of its choice of law principles.  (Id. at par. 11(a).)   It was further agreed that the Uniform Computer Information Transactions Act would *not* be applicable to the contracts at issue or the performance there under. (Id. at 11(b).)

---

[2] The SOW defines the "Project" as an "Oracle Chart of Accounts Redesign, 11.50 Project Costing & Billing, Upgrade to R12 and R12 Purchasing and iProcurement implementation services to Parexel."  (Ex. B, pg. 3 of 39); see generally Ex. B.

[3] There was a "not to exceed" amount of $1,158,004 for a portion of the Project while later parts of the Project costs were estimated with no contractually agreed limitations on the costs (i.e. with respect to the time and material estimates for the "remaining build, test, training and deployment..."). Id.

**Amendment to Statement of Work**

13.     On April 7, 2010, Parexel and Zensar entered into written modification of the SOW.  (See Exhibit C hereto, referred to as "Amendment No.1 to SOW.)

14.     As noted in the "Whereas" provisions therein, the parties amended the original SOW by "(i) fixing the amount owed for work done to date under the original SOW, (ii) providing additional detail and expanding the scope of work to be performed by [Zensar], and (iii) providing a fixed price and schedule for the performance of the remaining work under the SOW." (Id. at pg. 1, 2nd "Whereas" provision.)

15.     Amendment No. 1 to SOW initially required Parexel to pay Zensar the amount of $630,217 for all work performed under the original SOW within ten (10) days of the effective date of the Amendment to SOW. (See Id. at Section II(A).) Thereafter, the Amendment No. 1 to SOW reflects in relevant part that:

> PAREXEL shall pay [Zensar] a fixed amount of $3,200,000 (the "Fixed Fee"), including fees and all expenses, for the services and deliverables of this SOW Amendment.  A Quality Incentive, subject to specific quality exceptions described below, of $500,000 is also available to [Zensar] under this arrangement, provided that [Zensar] meets all of the criteria specified.

Id. at Section II (B).

16.     Amendment No. 1 to SOW also contains a description of the various projects to be completed by Zensar (defined as "Deliverables") for various project phases (defined as "Gates") with the total amount to be paid for professional fees and expenses to Zensar for each phase of the Project. (See Id., Section II (b) *et al*.)  Notwithstanding, the Amendment expressly

provided that there would not be "partial payments under the key implement gates I-IV", but rather that "payments will be made to [Zensar] by PAREXEL within 45 days after all deliverables under that implementation Gate have been delivered and accepted by PAREXEL..." (Id. at last full paragraph Section II(B) on pg. 4 of 26.) In relevant part thereafter, if Parexel determined that any:

> Deliverable does not perform according to the functional requirements specified for such Deliverable in this Amendment and the acceptance test developed therefore, PAREXEL shall have fifteen (15) days after the [Zensar's] submission of the Deliverable ("Acceptance Period") to give written (including email) notice thereof to [Zensar] specifying the deficiencies in detail.

> . . . .

> Notwithstanding the foregoing, if PAREXEL fails to reject any Deliverable within the Acceptance Period in the manner described above, such Deliverable shall be deemed accepted at the end of the Acceptance Period.

(Id. at Section III, pg. 6 of 26.)

17.     As it relates to that last "Gate" (i.e., Gate V), inartfully termed the "Quality Incentive", the particular deliverable to be provided was not predicated upon mere subjective criteria nor was it a discretionary bonus of any kind, rather the deliverable for Gate V was defined as to "include Critical system functionality defined in Attachment A [of the 1st Amendment to SOW], operating in accordance with the requirements defined herein as assessed by the Parexel Project team, as well as all Critical functionality in Attachment A not experiencing any Severity Level 1, 2 or 3 conditions all accepted by the Delivery Date.

(Id. at Section II (B), Note 6, page. 2 or 26.)

**Final Written Agreement Modification**

18.     Zensar and Parexel entered into a subsequent written agreement on October 28, 2010 expressly modifying the Amendment No. 1 to SOW.    In material part, Parexel acknowledged therein "that Zensar has made significant progress with respect to Gates I-V [out of the five Gates—as Gate five would be measured at the conclusion of the project]."    (See October 28, 2010 Agreement attached hereto as Exhibit D, hereinafter "Final Amendment".)[4] Per the terms of Final Amendment, Parexel agreed to and did pay to Zensar $2,560,000.00 toward the invoices and work completed by Zensar with respect to Gates I-IV. (Id.)

19.     As also reflected in the Final Amendment, Parexel developed and provided to Zensar a list of final Deliverables or "Incomplete Tasks" (attached to the Final Amendment) that Zensar agreed to complete and/or remediate.  In return for completion of the "Incomplete Tasks, Parexel agreed to pay "the remaining $640,000 which represent [sic] the balance amount required in the Final Amendment with respect to Gates I-IV…" (Id.)

20.     The Final Amendment further expressly recognized that payment for Gate V (i.e. the Quality Incentive payment) would be addressed later, with both parties "reserving any and all respective rights, positions and/or obligations relating to Gate V Deliverables."[5]

---

[4] The Final Amendment executed by a Parexel agent was only delivered to Zensar as a scanned attachment to an email.  The Final Amendment however appears to have not been correctly scanned in by Parexel, and the version attached to this Complaint as Exhibit D is an accurate copy of the version *received* by Zensar with this scanning error.  Attached as Exhibit E hereto is the "Acceptance Criteria" language that is missing in the scanned copy of the Final Amendment, that together with Exhibit D is a conformed copy of the actual Final Amendment entered by the parties.

[5] The Final Amendment also required Parexel to pay certain other funds relating to "change order #11" and for a charge order dated August 30, 2010.  Parexel paid these to separate amounts and Zensar's claim is not predicated upon said portion of the Final Amendment.

21.     With respect to any and all of the Gates, the Final Amendment provided for specific acceptance criteria by Parexel through an "Acceptance" mechanism very similar to that required under Amendment No. 1 to SOW.  In this respect, in material part, a written provision was agreed to wherein Zensar was to demonstrate the functionality of each Deliverable associated with any "incomplete tasks" and Parexel was then responsible for review and testing of same.  (Id.)  If any Deliverable did not perform according to the functional requirements, Parexel had ten (10) days after Zensar's submission of a deliverable to give written notice specifying any such deficiencies.  (Id).  In the event Parexel failed to notify Zensar of any deficiency of any Deliverable within ten (10) days after submission, such Deliverable shall be deemed acceptable.  (See Exhibits D & E).

**Zensar's Satisfactory Completion of All Deliverables**

22.     As is reflected in the open Deliverables chart that Parexel tendered as part of its executed Final Amendment (see Ex. D, pg. 2), there were some matters deemed to be solely the responsibility of Parexel (designated with an "X" under the "PXL" column) and there were also several deliverables already deemed as "Fixed" under the "Status" column thus needing no actions on the part of Zensar. Id.  Also, subsequent to the entry into the Final Amendment, there were also several Deliverables that Parexel affirmatively indicated in writing to Zensar not to complete or modify further for various reasons.[6]

23.     With respect to each and every remaining Deliverable/Incomplete Task reflected in the Final Amendment, Zensar  completed same, Zensar demonstrated to Parexel the

---

[6] Zensar required and retained all written communications from Parexel wherein Parexel expressly removed certain Deliverables from the Deliverables chart.

functionality of said deliverables and: (a) either received no response from Parexel at any time with respect any asserted deficiency (during the Acceptance Period or even after same) and/or (b) received a low level request for modifications or corrections that were timely and fully delivered by Zensar with no subsequent rejection by Parexel.

24.     On November 20, 2010, Zensar sent an email to Parexel project manager Chris Kiezulas entitled "ALL ISSUES RESOLVED" wherein an excel file was attached containing a comprehensive summary for Parexel notifying it, in relevant part, that: (a) all Deliverables required under the Final Amendment were completed and/or reiterations of actual acceptance by Parexel of full performance and/or(b) encapsulating any prior written instructions by Parexel of issues not to be completed and/or for which Zensar was not responsible for. (See Ex. F attached hereto). At no time did Parexel provide any writing or other communications reflecting rejection of any of said Deliverables.   In this respect, Zensar full met the "Acceptance Criteria" in the Final Amendment.

25.     As of the final Delivery Date agreed upon by the parties (i.e. November 30, 2010), there were no outstanding Severity Level 1, 2 or 3 conditions reported by Parexel to Zensar that were not timely and fully corrected to Level 4 or better.

26.     Zensar completed all of its contractual duties owed to Parexel.  Parexel has failed to pay Zensar $640,000 required to be paid pursuant to the 2nd paragraph of the Final Amendment.  Parexel has further failed to Pay Zensar the $500,000 required to be paid with respect to the Gate V Deliverables (i.e. Quality Incentive" provided by Zensar pursuant to Amendment No. 1 to SOW).

## COUNT I
## BREACH OF CONTRACT

27.     Zensar adopts and incorporates each of the above paragraphs as if fully reinstated and incorporated into this Court.

28.     Zensar entered into a valid written contract with Parexel, reflected in the MSA, the SOW, the Amendment No. 1 to SOW and the Final Amendment.

29.     Zensar fully performed its duties pursuant to the above noted contract.  Parexel, moreover, did not reject any of the Deliverables reflected in the Final Amendment nor in any respect did it provide notice of any deficiencies within 10 days or after respect to same.

30.     Parexel has refused, after repeated requests to pay Zensar the $640,000.00 amount owed per the second full paragraph of the Final Amendment.

31.     Similarly, Zensar met all of the conditions required and described in the Amendment No. 1 to SOW such that it is entitled to payment of $500,000.00 with respect to Gate V of the Project.

32.     Parexel has breached its contractual duties owed to Zensar by failing to pay the above noted amounts owed to Zensar.

33.     Zensar has been damaged by a result of Parexel's fiscal breach of the contracts at issue.

**WHEREFORE**, Zensar Technologies, Inc. prays that this Court find the Parexel be found to be in breach of the contract (along with its agreed modifications) at issue between the

parties and that Parexel be ordered to pay damages to Zensar in an amount to be determined by this Court, to include but not limited to actual damages, consequential damages, statutory interests and costs, as well as any and all further relief as this Court may deem just.

ZENSAR TECHNOLOGIES, INC.,

By its attorneys,

/s/ James T. Finnigan
James T. Finnigan (BBO #549620)
Rich May, a Professional Corporation
176 Federal Street
Boston, Massachusetts 02110
(617) 556-3872
jfinnigan@richmaylaw.com

Dated: March 17, 2011

Of Counsel:
Jon D. Cohen, ARDC No. 6206666
Stahl Cowen Crowley Addis LLC
55 W. Monroe St., Suite 1200
Chicago, Illinois 60603
(312) 641-0060 (voice)
(312) 423-8156
Jcohen@stahlcowen.com

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

ZENSAR TECHNOLOGIES, INC.,                )
                                          )
            Plaintiff,                    )
                                          )
                                          )
v.                                        )
                                          )
PAREXEL INTERNATIONAL LLC                 )
                                          )
            Defendant.                    )
-------------------------------------------- )

**Exhibit A**

# MASTER SERVICES AGREEMENT

**THIS MASTER SERVICES AGREEMENT** ("Agreement") is by and between **Zensar Technologies Limited,** a California corporation ("ZTD") with offices at 360 Lexington Avenue, 11th Floor, New York, NY 10017 and **PAREXEL International, LLC,** a Delaware company ("PAREXEL") with offices at 200 West Street, Waltham, Massachusetts 02451. This Agreement shall become effective on the date on which the last party to sign this Agreement affixes its signature here to (the "Effective Date").

1.     Master Agreement; Statements of Work.

       (a)     Agreement Structure. This is a Master Services Agreement containing terms and conditions to be applicable to one or more written Statements of Work ("SOWs"), which shall be numbered consecutively. A SOW shall specify services and any deliverables to be provided by ZTD (such services and deliverables together, "Services"), applicable fees, term for which Services shall be provided, specifications, service levels, and project timelines, as well as any requirements which are in addition to the general provisions of this Agreement, such as specific project milestones, acceptance criteria and/or other quality and warranty considerations. No SOW shall be effective unless signed by the parties. Any change in the Services or other provisions of the SOW may be made only by a written amendment signed by the parties. Except as otherwise expressly provided herein or in a SOW, ZTD shall supply all personnel, equipment, assets and facilities necessary to perform the Services.

       (b)     Parties to SOWs. Services purchased under this Agreement may be used by PAREXEL on behalf of itself and for the benefit of all its Affiliates. "Affiliate" means a legal entity (i) controlled by a party or (ii) controlling or under direct or indirect common control with a party. For purposes of this definition, "control" means (x) the ownership, directly or indirectly, of more than fifty percent (50%) of the voting securities or other equity interests of an entity (or if outside the United States and a foreign investor is not permitted to own more than fifty percent (50%), the maximum percent ownership allowed for a foreign investor); or (y) the possession, directly or indirectly, of the power to direct or cause the direction of the management and polices of an entity, whether through the ownership of voting securities, by contract, or otherwise. Any PAREXEL Affiliate may purchase Services directly by executing its own SOW. In such case, the PAREXEL Affiliate that signs the SOW shall be solely responsible for payment with respect to such Services, and shall be entitled to all rights and responsible for all obligations of PAREXEL under this Agreement, with respect to the particular Services purchased by such PAREXEL Affiliate.

       (c)     Relationship of Agreement and SOWs. Each SOW shall be incorporated into and subject to the terms of this Agreement. A SOW may contain terms and conditions in addition to those in this Agreement. However, if a SOW contains terms or conditions that directly conflict with this Agreement, the provisions of this Agreement shall control, unless the SOW expressly provides that such conflicting term or condition supersedes this Agreement. Such additional or different terms or conditions shall be applicable only to the SOW in which they are contained.

(d)     No Minimum/No Exclusivity.  Nothing contained in this Agreement alone shall constitute a commitment by PAREXEL to purchase Services.  Such a commitment shall arise only from an SOW signed by the parties.  This Agreement is nonexclusive, and PAREXEL may contract with other entities to perform services related to or within the terms of any SOW.

2.     Term and Termination.

(a)     Term of Agreement.  This Agreement shall remain in effect for a term of one (1) year from the Effective Date with automatic renewals for successive one (1) year terms, unless PAREXEL provides ZTD with written notice of non-renewal at least sixty (60) days prior to the end of the then-current term.

(b)     Term of SOWs.  Each SOW shall commence as of the Commencement Date as defined in such SOW and shall continue for the term and renewal periods (if any) set forth in such SOW.

(c)     Termination of SOWs.  Either party to a SOW may terminate such SOW for cause upon not less than thirty (30) days' prior written notice to the other upon the occurrence of any of the following:  (i) the other party's material breach of any provision of the SOW or this Agreement as it applies to such SOW provided that such breach has not been cured to the non-breaching party's satisfaction within thirty (30) days after such notice; or (ii) if the non-terminating party shall be or become insolvent, shall call any meeting of creditors or have appointed a receiver or trustee over itself or its assets, or if any petition, proceeding or other action under any bankruptcy laws shall be filed by or instituted against the non-terminating party.  PAREXEL may terminate any SOW for its convenience upon not less than thirty (30) days' prior written notice to ZTD.

(d)     Termination of the Agreement.  Only PAREXEL (and not any PAREXEL Affiliate) or ZTD shall have the right to terminate the Agreement for cause upon not less than thirty (30) days' prior written notice to the other upon the occurrence of any of the following:  (i) the other party's material breach of any provision of this Agreement independent of any SOW provided that such breach has not been cured to the non-breaching party's satisfaction within thirty (30) days after such notice; or (ii) if the non-terminating party shall be or become insolvent, shall call any meeting of creditors or have appointed a receiver or trustee over itself or its assets, or if any petition, proceeding or other action under any bankruptcy laws shall be filed by or instituted against the non-terminating party.  PAREXEL (and not any PAREXEL Affiliate) may terminate the Agreement for its convenience upon not less than thirty (30) days' prior written notice to ZTD.

(e)     Duties Upon Termination or Expiration.  Upon termination or expiration of any SOW, ZTD shall send PAREXEL its final invoice for such SOW and PAREXEL shall pay ZTD for Services performed in accordance with such SOW and this Agreement prior to termination or expiration.  Upon termination of any SOW, ZTD shall refund PAREXEL any pre-payments made by PAREXEL on account of Services which were intended to be performed beyond the termination date.  Upon termination or expiration of any SOW, as relates to such expired or terminated SOW, ZTD shall, at no additional cost, (i) deliver all completed work and work in progress to PAREXEL or its designee, (ii) provide PAREXEL or its designee a written

report on the status of the Services in a form and level of detail reasonably satisfactory to PAREXEL, (iii) make ZTD's personnel reasonably available to meet with PAREXEL or its designee, (iv) provide such further information as PAREXEL or its designee may reasonably request, and (v) cooperate with and assist PAREXEL to wind-down the Services and transfer the Services to PAREXEL or its designee. Upon PAREXEL's written request, ZTD also shall continue to perform the Services at the then-current rates set forth in the SOW for a period not to exceed six (6) months and the SOW and this Agreement shall continue in effect throughout such period.

(f) Effect of Termination. Termination of any one or more SOWs shall not constitute a termination of this Agreement or any remaining SOWs not so terminated. If this Agreement is terminated or expires prior to the termination or expiration of the then-current term of any SOWs and such SOWs are not also expressly terminated or have not expired, then such SOWs shall continue for the then-current term and this Agreement shall continue in effect with respect to such SOWs until the termination or expiration of the then-current term of such SOWs. Termination of this Agreement or any SOW shall not limit either party from pursuing any other remedies available to it pursuant to this Agreement.

3.   Services.

(a) Obligation to Provide Services. ZTD shall provide the Services described in each SOW.

(b) Use of Licensed Materials. If ZTD is to use any software or other material licensed to PAREXEL or any PAREXEL Affiliate by a third party, such use must be permitted by and shall be subject to any restrictions in the applicable license. ZTD may be required to execute a confidentiality agreement, sublicense or other appropriate agreement with PAREXEL, PAREXEL Affiliate and/or such third party prior to such use.

(c) Business Continuity. ZTD shall maintain and comply with a reasonable disaster recovery, crisis management and/or business continuity plan acceptable to PAREXEL which is capable of ensuring ZTD shall be able to continue to provide the Services in accordance with the SOW and this Agreement in the event of a disaster or other significant event that might otherwise impact ZTD's operations.

(d) Services Not to Be Withheld. ZTD shall not voluntarily refuse to provide all or any portion of the Services except ZTD may refuse Services upon PAREXEL's failure to pay undisputed amounts due after notice and an opportunity to cure as applicable to material breaches. If ZTD breaches or threatens to breach this Section, ZTD agrees that PAREXEL shall be irreparably harmed and shall be entitled to apply to a court of competent jurisdiction for and be granted an injunction compelling specific performance by ZTD without the necessity of posting any bond notwithstanding anything else to the contrary in this Agreement.

(e) Quality Assurance. PAREXEL shall have the right to conduct audits, to monitor and to perform or witness inspections or tests of the Services furnished hereunder or to otherwise determine ZTD's compliance with the SOW and the Agreement, at ZTD's facility or

at such other location where the Services are being developed or provided, at no charge to PAREXEL.

(f)    Divestiture of PAREXEL or Affiliates.  If PAREXEL, any PAREXEL Affiliate or other PAREXEL operation is divested during the term of this Agreement (each, a "Divested Business") but PAREXEL desires ZTD to continue to provide some or all of the Services to or for the benefit of such Divested Business, ZTD shall continue to provide such Services if such Divested Business (i) used or benefited from the Services prior to being divested, (ii) after being divested uses or benefits from either essentially the same Services as before being divested, or otherwise does not require ZTD to modify its systems or processes used to perform and provide the Services in any material way, and (iii) agrees to be the subject to the provisions of the applicable SOW and this Agreement.  ZTD shall charge, at PAREXEL's option, PAREXEL or the Divested Business for such Services based on the existing charging methodologies for the Services.  ZTD shall not be required to provide the Services to any Divested Business for more than one (1) year following the date of divestiture.

4.    Representations and Warranties.

(a)    Services.  ZTD represents and warrants that its Services hereunder shall be provided by qualified individuals in a professional and workmanlike manner conforming to the highest industry standards and practices, and in strict accordance with all applicable law, regulations, codes and standards of government agencies, authorities or self regulatory organizations having jurisdiction, and shall conform to any additional warranties, specifications, service levels and time frames in the SOW.

(b)    No Claims/No Infringement.  ZTD represents and warrants that no claim (whether or not embodied in an action, past or present) that the Services infringe on any patent, copyright, trademark or service mark, or misappropriate any trade secret or other proprietary right, has been threatened or asserted, and no such claim is pending against ZTD or against any entity from which ZTD obtained such rights.  ZTD represents and warrants that PAREXEL's use of the Services as contemplated in the SOW and this Agreement shall not infringe on any patent, copyright, trademark, or service mark or misappropriate any trade secret or infringe any proprietary or intellectual property right of any party, including without limitation ZTD, any employee or contractor of ZTD or any third party.

(c)    No Hidden Costs.  ZTD represents and warrants that (i) any licenses or agreements from or with any third party that must be obtained by PAREXEL for the PAREXEL to use the Services as provided in this Agreement are expressly set forth in the applicable SOW and (ii) there are no additional, undisclosed license fees or expenses payable to third parties required to be paid by PAREXEL for the PAREXEL to use the Services as provided in this Agreement.

(d)    Malware and Disabling Code.

(i)    "Malware" means computer software, code or instructions that (A) adversely affect the operation, security or integrity of a computing, telecommunications or other digital operating or processing system or environment, including without

limitation, other programs, data, databases, computer libraries and computer and communications equipment, by altering, destroying, disrupting or inhibiting such operation, security or integrity; (B) without functional purpose, self-replicate without manual intervention; (C) purport to perform a useful function but which actually perform either a destructive or harmful function, or perform no useful function and utilize substantial computer, telecommunications or memory resources; or (D) without authorization collect and/or transmit to third parties any information or data, including without limitation such software, code or instructions commonly known as viruses, Trojans, logic bombs, worms, adware and spyware.

(ii) "Disabling Code" means any code which could have the effect of permitting improper use, access, deletion or modification of, or, unless PAREXEL agrees otherwise in writing, disabling, deactivating, damaging or shutting down one or more software programs or systems and/or hardware or hardware systems, including without limitation, time bombs, protect codes, data destruction keys, trap doors and similar code or devices.

(iii) Throughout the term of any SOW, ZTD shall take commercially reasonable measures consistent with the highest industry standards to prevent the coding or introduction of any Malware or Disabling Code into the Services and any PAREXEL or PAREXEL Affiliate system interfacing with the Services, including without limitation the information, data and other materials delivered by or on behalf of ZTD to the PAREXEL, any PAREXEL Affiliate or their customers or third party ZTDs, or the introduction of any Malware into operating environments and processes used by ZTD to provide the Services. ZTD shall continue to review, analyze and implement improvements to and upgrades of its Malware prevention and correction programs and processes that are reasonable and consistent with the highest industry standards. If Malware or Disabling Code is found to have been introduced into the Services, any PAREXEL or PAREXEL Affiliate system interfacing with the Services, or the information, data and other materials delivered by or on behalf of ZTD to the PAREXEL, any PAREXEL Affiliate or their customers or third party ZTDs, or if any Malware is found to have been introduced into the operating environments and processes used by ZTD to provide the Services, ZTD shall promptly notify the PAREXEL (and any affected PAREXEL Affiliate) and ZTD shall take immediate and continuing action to eliminate the Malware or Disabling Code and remediate its effects at ZTD's expense; provided, however, ZTD shall not take any such action with respect to the systems of PAREXEL's or PAREXEL Affiliates' customers and third party ZTDs except at PAREXEL's request. Not withstanding the foregoing, if such Malware or Disabling Code was introduced by or through the PAREXEL or a PAREXEL Affiliate and ZTD has complied with its obligations set forth in this Section, PAREXEL shall be responsible for the reasonable costs incurred by ZTD to eliminate and remediate the effects of such Malware or Disabling Code. At PAREXEL's request, ZTD shall report to PAREXEL the nature and status of all Malware and Disabling Code elimination and remediation efforts.

(e) Open Source Software. ZTD represents and warrants that unless PAREXEL agrees otherwise in writing, the Services including without limitation any software included in the Services or otherwise provided by ZTD hereunder shall not contain any open

source software, shareware, freeware or other similar software, and except for the license and other terms expressly set forth in this Agreement, the software provided by ZTD is not subject to any other express or implied terms, conditions or restrictions, including, but not limited to, additional license terms.

(f)     Export Control.   ZTD represents and warrants that any technology (including without limitation any hardware or software) provided by ZTD or its designee to PAREXEL or a PAREXEL Affiliate as part of the Services (i) is not designated for control under the U.S. Munitions List of the International Traffic in Arms Regulations of the Department of State and (ii) does not fall within an Export Control Classification Number under the Commerce Control List requiring an export license under the U.S. Export Administration Regulations of the Bureau of Industry and Security of the Department of Commerce.

(g)     Exclusive Warranties.   THE FOREGOING WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, REGARDING THE QUALITY OR PERFORMANCE LEVEL OF SERVICES, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

5.     Personnel.

(a)     Project Management.   Each party shall designate in each SOW a project manager who shall be such party's primary point of contact regarding the Services. Each party may designate a new project manager upon reasonable written notice to the other party.

(b)     Removal of ZTD Personnel.   Upon written notice to ZTD, PAREXEL may require that ZTD promptly remove any ZTD employee or agent who is not providing Services in accordance with the Agreement or the SOW. In such event, ZTD shall promptly provide qualified replacement personnel and shall pay the costs attributable to familiarizing such personnel with the Services.

(c)     Compliance with PAREXEL Policies by ZTD Personnel.   ZTD, its employees and agents shall comply with PAREXEL's guidelines and policies applicable to providers of goods and/or services to PAREXEL, including without limitation PAREXEL's Code of Ethics applicable to such providers. ZTD, its employees and agents also shall comply with PAREXEL's safety and security policies applicable to providers. These policies may include, without limitation, the requirement that PAREXEL screen ZTD, its employees and agents against government-restricted lists and/or that ZTD provide at its expense criminal background checks and/or drug screenings of its employees and agents.

(d)     Notice of Labor Disputes.   ZTD shall promptly notify PAREXEL of any and all pending labor complaints, disputes or controversies involving any of ZTD's employees, permitted subcontractors or agents providing Services pursuant to this Agreement and shall regularly report to PAREXEL the progress and status thereof. ZTD shall use all reasonable efforts to resolve any such complaint, dispute or controversy.

6.    Nondisclosure.

(a)    Confidential Information.  Each party may have access to information from the other party or its Affiliates that would reasonably be considered proprietary or confidential, including but not limited to the other party's or its Affiliates' financial information, technical information, business plans, policies, or products ("Confidential Information" or "CI"). PAREXEL's CI shall include any written reports, findings, conclusions, recommendations, or reporting data and analysis prepared by ZTD and provided to PAREXEL under this Agreement. ZTD also may have access to personally identifiable information of current, former and prospective customers and employees of PAREXEL or PAREXEL Affiliates ("Personal Information" or "PI").  Without limiting the foregoing, PI includes (i) non-public personally identifiable information of individuals who seek to obtain, obtain or have obtained insurance or other financial products or services from PAREXEL or its Affiliates which products and services are used or intended to be used for personal, family or household purposes, and (ii) Protected Health Information as defined in 45 Code of Federal Regulations Section 164.501, as amended from time to time.

(b)    Exclusions.  A party's CI shall not include information that (i) is or becomes a part of the public domain through no act or omission of the other party in violation of this Agreement; (ii) was in the other party's lawful possession prior to the disclosure and had not been obtained under an obligation of confidentiality by the other party either directly or indirectly from the disclosing party; (iii) is lawfully disclosed to the other party by a third party not known by the receiving party to be bound by a duty of non-disclosure; or (iv) is independently developed by the other party without use of the CI.  One party may disclose the other party's CI or PI without violation hereof to the extent such disclosure is required by applicable law, regulation or governmental or judicial order; provided, that the party making such disclosure has given the other party advance written notice of the intended disclosure and a reasonable opportunity to seek a protective order or other confidential treatment of the CI or PI, each to the extent permitted by law; provided, further, that the disclosure is limited to that required by such applicable law, regulation or governmental or judicial order.

(c)    Use and Nondisclosure.  The parties agree to hold each other's CI in confidence, and ZTD agrees to hold PI in confidence.  Each party agrees to use the other's CI, and in ZTD's case, PI, in accordance with all applicable laws.  Each party agrees not to use the other's CI, and ZTD agrees not to use PI, for any purpose other than the implementation of this Agreement and not to make each other's CI or, in the case of ZTD, PI, available in any form to any third party, except that CI or PI may be disclosed to the parties' Affiliates, attorneys, accountants, agents, contractors and consultants on a need-to-know basis under obligations of confidentiality and limited use at least as restrictive as those contained herein.  ZTD agrees not to transmit PAREXEL's CI or PI to any country other than the country of origin for such Information without PAREXEL's prior written consent.  Each party agrees to use the same degree of care that it uses to protect its own confidential information of a similar nature and value, but in no event less than a reasonable standard of care, to ensure that the other party's CI and, in the case of ZTD, PI, is not disclosed or distributed by its employees, Affiliates, attorneys, accountants, agents, contractors, consultants or agents in violation of this Agreement.  Such care shall include, but not be limited to, ZTD's maintenance of appropriate administrative, technical, procedural and physical safeguards to: (i) ensure the security, integrity and confidentiality of

PAREXEL's CI and PI, (ii) protect against any anticipated threats or hazards to the confidentiality, security or integrity of PAREXEL's CI and PI, and (iii) protect against unauthorized access to or use of PAREXEL's CI and PI. PAREXEL shall have the right to inspect ZTD's practices regarding PAREXEL's CI and PI upon reasonable advance notice. Each party shall be responsible for any breaches of this nondisclosure Section by any of its employees, Affiliates, attorneys, accountants, agents, contractors or consultants.

(d)     Security Breaches. ZTD shall promptly report to PAREXEL any unauthorized access to or disclosure or use of PAREXEL's CI or PI by ZTD or its agents (each, a "Security Breach"). ZTD shall provide PAREXEL with a detailed description of the Security Breach, the type of data that was the subject of the Security Breach, the name and any other identifying information of each affected individual (if applicable) that is in ZTD's possession, and any other information PAREXEL may request concerning the Security Breach as soon as such information can be obtained. ZTD agrees to take action immediately, at its own expense, to (i) investigate the Security Breach, including without limitation its causes and effects, (ii) identify, prevent and mitigate the effects of any such Security Breach, (iii) carry out any recovery or other action necessary to remedy the Security Breach and prevent a recurrence, and (iv) notify PAREXEL of the progress and results of the foregoing. At PAREXEL's option, such action shall include without limitation: (A) ZTD's mailing of notices regarding the Security Breach to affected individuals (if applicable), the content of which shall be subject to PAREXEL's prior written approval; and/or (B) ZTD's provision of credit monitoring or other similar service to affected individuals (if applicable) offered by a reputable provider, for a reasonable duration but not less than twelve months, and including identity theft protection in a reasonable amount but not less than twenty thousand dollars per affected individual. Alternatively, PAREXEL may undertake either or both of the foregoing actions at ZTD's expense. None of the foregoing actions shall limit any other remedies available to PAREXEL pursuant to this Agreement. ZTD shall not issue any press release or make any other public filing, report or communication regarding the Security Breach without PAREXEL's prior written approval unless otherwise required by applicable law, regulation or governmental or judicial order; provided, that in such case ZTD has given PAREXEL advance written notice of the intended disclosure and a reasonable opportunity to seek a protective order or other confidential treatment of the information, each to the extent permitted by law; provided, further, that the disclosure is limited to that required by such applicable law, regulation or governmental or judicial order.

(e)     Length of Obligation and Return of Information. The receiving party shall at any time upon the disclosing party's written request either return or destroy, at the receiving party's option, the disclosing party's CI and/or, in the case of PAREXEL as the disclosing party, PI. Notwithstanding the foregoing, either party may keep a copy of the other party's CI solely for maintaining reasonably appropriate business records or as may be required by law. A party's CI, other than those portions of CI described below, shall be subject to these confidentiality obligations for five (5) years after the termination or expiration of the last SOW to which such CI pertains. Those portions of CI that are comprised of trade secrets shall be subject to these provisions for so long as they remain protected as trade secrets under applicable law. PI and computer source code shall be subject to these provisions in perpetuity.

(f)     Publicity.  ZTD and its agents agree that, unless required by law, (i) no press release, acknowledgment or other information concerning the Agreement and the Services provided hereunder shall be made public by the ZTD without the prior written agreement of PAREXEL, and (ii) ZTD or its agents shall not identify PAREXEL or any PAREXEL Affiliate as a customer nor shall ZTD or its agents use PAREXEL's or a PAREXEL Affiliate's name, photographs, logo, trademark, or other identifying characteristics without PAREXEL's prior written approval.

7.     Intellectual Property.

(a)     Definitions.

(i)     The term "Materials" means all intellectual property rights, including without limitation all patents, patent applications, patent rights, trademarks, trademark applications, trade names, trade dress, service marks, service mark applications, domain names, copyrights, copyright applications, computer programs and other computer software (including, without limitation, all source and object code, algorithms, architecture, structure, display screens, layouts and development tools), inventions, designs, samples, specifications, schematics, know-how, trade secrets, processes, formulae, development tools, discoveries, improvements, ideas, techniques, materials, flow charts, outlines, lists, compilations, manuscripts, writings and pictorial materials, and all documentation and media constituting, describing or relating to the foregoing, including without limitation, manuals, memoranda and records.

(ii)     The term "Derivative Work" means a work based on one or more pre-existing works, including, without limitation, a condensation, transformation, expansion or adaptation, that, if prepared without authorization of the owner of the copyright of such pre-existing work, would constitute a copyright infringement.

(iii)     The term "Residuals" means the general knowledge and experience, including without limitation processes, methods, techniques, know-how and concepts, developed or acquired by a party in the course of the Services, but excluding any CI of the other party and any PI.

(iv)     The term "Work Product" means all Materials created or developed by either party in connection with the Services during the term of this Agreement or any SOW.

(b)     Ownership of Pre-existing Materials.   All pre-existing Materials of PAREXEL or a PAREXEL Affiliate shall, as between PAREXEL and ZTD, be the property of PAREXEL or such Affiliate, as the case may be.  All pre-existing Materials of ZTD or its ZTDs shall, as between ZTD and PAREXEL, be the property of ZTD or its ZTDs, as the case may be.

(c)     Ownership of Work Product.

(i)     PAREXEL Ownership.  PAREXEL shall be the sole owner of, with the exclusive right to use and exploit, all Work Product on an as-created basis.  ZTD shall notify PAREXEL of and assign to PAREXEL all Work Product on an as-created

basis. ZTD agrees that, to the fullest extent permitted under the U.S. Copyright Act, PAREXEL shall own the copyright to the Work Product, and that ZTD shall develop such Work Product as work made for hire. Any modifications, improvements or amendments to any pre-existing ZTD or its ZTDs' Materials shall be solely owned by ZTD or its ZTDs only if such improvements, amendments or modifications are not included or incorporated in any way in any Work Product, and such Materials shall not be created using PAREXEL resources nor shall PAREXEL be charged for the creation of such Materials.

(ii)  <u>License to Pre-existing Materials</u>.  ZTD shall notify PAREXEL of all pre-existing ZTD or its ZTDs' Materials incorporated into or otherwise necessary to use, modify or maintain any Work Product and ZTD hereby grants to PAREXEL and PAREXEL Affiliates a non-exclusive, perpetual, irrevocable, royalty free, worldwide, limited-transferable (as set forth below) right and license to use, make, have made, sell, practice, copy, display, distribute, maintain, modify and create Derivative Works from, in any and all media, pre-existing ZTD or its ZTDs' Materials incorporated into or otherwise necessary to use, modify or maintain any Work Product (A) for internal use within PAREXEL and PAREXEL Affiliates, or (B) otherwise in commerce in the normal course of PAREXEL's or PAREXEL Affiliates' businesses; provided, that PAREXEL's and PAREXEL Affiliates' rights to such shall be solely in connection with the Work Product. Such license to ZTD or its ZTDs' Materials may be transferred, assigned or sublicensed to any third party in connection with the sale, merger or disposition of the Work Product or the PAREXEL or PAREXEL Affiliate business or assets to which the Work Product relates. To the extent permitted by PAREXEL or a PAREXEL Affiliate, the agents, brokers, customers, third party administrators, consultants and contractors of PAREXEL and PAREXEL Affiliates shall also have the right to use the ZTD or its ZTDs' Materials under the license granted hereunder in connection with the business of PAREXEL or PAREXEL Affiliates.

(iii)  <u>No Further Use by ZTD of Work Product</u>.  ZTD agrees that it shall not provide to other clients and customers, nor use in any way in the course of later engagements, the specific Work Product created for and delivered to PAREXEL pursuant to this Agreement. PAREXEL acknowledges that in the course of ZTD's business, ZTD may develop, use, and distribute works that are substantially similar to the Work Product, including works similar in function, structure, sequence, or organization of the Work Product.

(d)  <u>Residuals</u>.  Each party shall have the right to use for any purpose any Residuals from any Work Product.

(e)  <u>Further Assurances</u>.  Each party covenants and agrees, on its own behalf and on behalf of its employees, agents, successors and assigns, without further compensation, to promptly at any time upon the request of another party, its successors and assigns to provide such further information and execute such further assignments and documents, give testimony, and take all further legal acts as reasonably requested by the other party to perfect title to, or to acquire, transfer and maintain patent, copyright, trademark, mask work, trade secret and other legal protection for, Materials owned by the requesting party pursuant to this Section.

8.     Limitations on Liability.  Except with respect to any indemnification obligations set forth in this Agreement, neither party nor its Affiliates, nor any of such party's or its Affiliates' respective directors, officers, employees or agents, shall be liable to the other party or its Affiliates, or any of such other party's or its Affiliates' respective directors, officers, employees or agents, for any consequential, incidental, special, indirect, punitive or exemplary damages, including loss of profits and loss of business arising out of or related to this Agreement. The parties shall remain liable for direct damages for claims arising out of or related to this Agreement, including but not limited to the cost to obtain substitute services or deliverables.

9.     Indemnification.

(a)     Certain Claims.  Each party shall indemnify and hold harmless the other party, the other party's Affiliates, and each of such other party's and such other party's Affiliates' respective directors, officers, employees and agents (each, an "Indemnified Party") from all losses, damages, injuries, costs and expenses (including without limitation court costs and reasonable attorneys' fees) associated with each of the following, provided in each case that the Indemnified Party comply with the procedure set forth below:

(i)     claims asserted by a third party, against the party claiming indemnification and directly and proximately caused by the acts or omissions of the other party (the "Indemnifying Party"), its Affiliates and/or each of their directors, officers, employees or agents (collectively together with the Indemnifying Party, the "Indemnifying Group"), arising out of or related to this Agreement;

(ii)     personal injury, including death, or damage to tangible property, suffered by any Indemnified Party and directly and proximately caused by the acts or omissions of any member of the Indemnifying Group, arising out of or related to this Agreement;

(iii)     willful misconduct, gross negligence, or violation of applicable law by any member of the Indemnifying Group, arising out of or related to this Agreement.

(b)     Infringement Claims.  ZTD shall indemnify and hold harmless any PAREXEL Indemnified Party from all losses, damages, injuries, costs and expenses (including without limitation court costs and reasonable attorneys' fees) related to any claim that any Materials furnished by ZTD and used by or for any PAREXEL Indemnified Party in connection with the Services infringe a third party's copyright, trademark, servicemark or patent, misappropriates a third party's trade secret, or otherwise infringe any third party's intellectual property or proprietary right, provided that the PAREXEL comply with the procedure set forth below.  ZTD shall have no liability for any claim of infringement or misappropriation resulting from:  (i) the PAREXEL Indemnified Party's use of a superseded or altered release of some or all of such Materials if infringement would have been completely avoided by the use of a subsequent unaltered release of such Materials, if such subsequent release is provided on a timely basis at no additional cost, and following a reasonable period for such subsequent release to be implemented, or (ii) the PAREXEL Indemnified Party's use of such Materials in conjunction with software, data, or material not furnished by ZTD unless the possibility of such

use was known, recommended, authorized or approved by ZTD. In the event that some or all Materials furnished by ZTD are held or are believed by PAREXEL to infringe or misappropriate, ZTD shall, at its expense and without limiting any other remedy available to the PAREXEL Indemnified Party pursuant to this Agreement, either (x) modify such Materials to make them non-infringing while retaining the same or equivalent functionality, (y) obtain for any PAREXEL Indemnified Party who had a right to use the Materials, a license to continue using such Materials or (z) replace the Materials with substantially similar Materials with the same or equivalent functionality.

(c)     Claims Regarding Personal Information.  ZTD shall indemnify and hold harmless any PAREXEL Indemnified Party from all losses, damages, injuries, costs and expenses (including without limitation court costs and reasonable attorneys' fees) arising out of the breach by any member of the ZTD Indemnifying Group of its obligations pursuant to Section 6 above with respect to Personal Information, provided that the PAREXEL comply with the procedure set forth below.

(d)     Procedure.     The following procedure shall be applicable to indemnification sought pursuant to this Section.  The Indemnified Party shall promptly notify the Indemnifying Party of a claim subject to this Section; provided however, that failure to do so shall not preclude such party's right to indemnification if such failure does not materially prejudice the Indemnifying Party, and if such failure does materially prejudice the Indemnifying Party then the Indemnified Party's rights shall only be diminished to the extent of the prejudice. The Indemnified Party shall control the defense and/or settlement of the claim; provided, however, that upon receipt of notice of the claim, the Indemnifying Party shall have the right to assume control the defense of the claim by providing the Indemnified Party notice of such assumption within thirty (30) days after receipt of notice of the claim.  The Indemnifying Party's control of the defense shall include the right to compromise or settle such claim for money damages which the Indemnifying Party shall pay with no admission of wrongdoing by the Indemnified Party; provided, however, that any compromise or settlement shall include an unconditional release of the Indemnified Party of all liability on such claim.   Any other compromise or settlement must be approved by the Indemnified Party which approval shall not be unreasonably withheld, conditioned or delayed.  If the Indemnifying Party assumes control of the defense, (i) the Indemnified Party shall participate in such defense and/or settlement as reasonably requested by the Indemnifying Party and at the Indemnifying Party's expense, and (ii) the Indemnified Party in any event may choose to continue to participate in the defense and/or settlement with counsel of its own choosing at its own expense.

10.    Fees.

(a)     Fees for Services.  Services shall be provided at the price set forth in the SOW.  ZTD shall not increase such price during the term or any renewal of the SOW. Additional work by ZTD outside the original scope of work in the SOW shall not be charged unless specifically agreed in a writing signed by the parties.

(b)     Purchase Orders, Invoices and Payment.   PAREXEL shall issue a purchase order on or about the time of execution of a SOW.  Notwithstanding the execution of a SOW, PAREXEL shall be liable only for Services ordered by written purchase order to ZTD.  In

the event of any conflict between the pre-printed terms and conditions on a purchase order and the relevant SOW and this Agreement, the terms of the SOW and this Agreement shall prevail. ZTD shall invoice PAREXEL monthly in arrears unless otherwise expressly specified in the applicable SOW. PAREXEL shall pay undisputed charges within forty-five (45) days of PAREXEL's receipt of a correct invoice. If goods are provided in connection with the Services, ZTD shall separately itemize the charges for goods and the charges for Services.

(c)     Expenses.  To the extent set forth in the applicable SOW, appropriate travel and reasonable out-of-pocket expenses incurred by ZTD in connection with the Services performed shall be invoiced and reimbursed by PAREXEL to ZTD. ZTD agrees that any such expenses for which ZTD shall seek reimbursement from PAREXEL shall be in accordance with PAREXEL's general policies for such expenses applicable to providers of goods and/or services to PAREXEL and must be approved in writing in advance by PAREXEL.

(d)     Taxes.

(i)     Each party shall be responsible for any personal property taxes on property it owns or leases, for franchise and privilege taxes on its business, and for taxes based on its net income or gross receipts.

(ii)     ZTD shall be responsible for any sales, use, excise, value-added, services, consumption, and other taxes and duties payable by ZTD on any goods or services used or consumed by ZTD in providing the Services hereunder, or any subsequent amendment or modification hereto, if the tax is imposed on ZTD's acquisition or use of such goods or services and the amount of tax is measured by ZTD's costs in acquiring such goods or services.

(iii)     PAREXEL shall be responsible for any sales, use, excise, value-added, services, consumption, and other taxes and duties assessed on any fees charged by ZTD to PAREXEL in the performance of this Agreement. PAREXEL may report and (as appropriate) pay such taxes directly if PAREXEL provides ZTD with a direct pay or exemption certificate.

(iv)     The parties agree to cooperate with each other to enable each to more accurately determine its own tax liability and to minimize such liability to the extent legally permissible. ZTD's invoices shall separately state the amounts of any taxes ZTD is proposing to collect from PAREXEL. Each party shall provide and make available to the other any resale or direct pay certificates, information regarding out-of-state or out-of-country sales or use of equipment, materials, or services, and other exemption certificates or information reasonably requested by either party.

11.     Dispute Resolution.

(a)     Governing Law. This Agreement shall be governed by and interpreted in accordance with the laws of the Commonwealth of Massachusetts without regard to any of its choice of law principles that would require the application of the law of any other jurisdiction.

(b)   UCITA.   Notwithstanding the foregoing, the parties agree that the Uniform Computer Information Transactions Act (UCITA), if and to the extent enacted in such State, shall not apply to this Agreement or any performance hereunder and the parties expressly opt-out of the applicability of UCITA to this Agreement.

12.   Insurance.

(a)   ZTD will carry and maintain the following insurance policies: Workers' Compensation, Employer's Liability, Commercial General Liability, Commercial Automobile Liability, Umbrella/Excess Liability, Professional Liability, and Environmental Impairment Liability in accordance with the following minimum limits:  $1,000,000 for General Liability, Commercial Automobile Liability, Workers' Compensation, Employer Liability and $5,000,000 for Umbrella/Excess Liability and Professional Liability.

(b)   PAREXEL, its directors, officers and employees will be named as additional insureds under all General Liability, Automobile Liability and Umbrella/Excess Liability Policies obtained by ZTD. All of the insurance afforded by the CONTRACTOR will be exhausted before PAREXEL becomes involved, including PAREXEL's coverage as an additional insured under the ZTD's Umbrella/Excess Liability insurance policy(ies). PAREXEL's insurance coverage will be excess over any insurance afforded by the ZTD.

13.   Miscellaneous Provisions.

(a)   PAREXEL Records.   ZTD shall maintain accurate records of all amounts billable to, and payments made by, PAREXEL pursuant to this Agreement in accordance with generally accepted accounting principles. PAREXEL shall have access to and the right to copy such records, upon prior written request to ZTD, at all reasonable times during ZTD's normal business hours during the period in which ZTD is required to maintain such records. ZTD further agrees to cooperate to the fullest extent possible with any request for records or other information submitted by PAREXEL or on its behalf and relating to any request or order PAREXEL receives from any state or federal court, agency or administrator.

(b)   Independent Contractor.   ZTD's employees and agents are independent contractors with respect to PAREXEL, and ZTD shall be solely responsible for their supervision, daily direction and control. Nothing in this Agreement shall be construed to create a partnership, joint venture, or agency relationship between the parties. Nothing in this Agreement shall be interpreted or construed as creating the relationship of employer and employee between PAREXEL or its Affiliates and either ZTD or any employee or agent of ZTD. Each party shall be solely responsible for payment of all compensation owed to its employees and agents, and for all federal and state income tax withholding, Social Security taxes, and unemployment insurance applicable to such personnel as employees of the applicable party. Each party shall bear sole responsibility for any health or disability insurance, retirement benefits, or other welfare or pension benefits (if any) to which such party's employees and agents may be entitled. Each party agrees to indemnify and hold harmless the other party, its Affiliates, and each of such other party's or such other party's Affiliates' directors, officers, employees and agents, against any

claims that the indemnified party has failed to pay compensation or taxes or provide insurance or benefits for employees or agents of the indemnifying party.

(c)   Assignment/Subcontracting/Outsourcing.  This Agreement and any SOW hereunder may not be assigned, subcontracted, or outsourced in whole or in part without the prior written consent of the other party, except to (i) an Affiliate, or (ii) any successor to all or substantially all of the stock or assets of the assigning party via merger, acquisition or other similar corporate transaction.  Any other purported assignment, subcontracting or outsourcing without consent shall be deemed null and void and of no effect.  ZTD shall remain responsible for permitted assignees', subcontractors', and outsourcers' performance, pursuant to this Agreement as if ZTD performed the Services itself and shall ensure that all such entities and their employees and agents are bound by and comply with the terms and conditions of this Agreement, including without limitation, the Sections regarding intellectual property and nondisclosure.

(d)   Force Majeure.  Except as set forth below, neither party shall be in default or otherwise liable for any delay in or failure of its performance under this Agreement or any SOW to the extent such delay or failure arises by reason of any act of God, any governmental requirement or war; provided, that if ZTD is the party experiencing such failure, it shall have exhausted the procedures described in its business continuity plan.  A party claiming the benefit of this provision shall, as soon as reasonably practicable after the occurrence of any such event: (i) notify the other party of the nature and extent of any such condition referred to in the preceding sentence, and (ii) use due diligence to remove any such causes and resume performance under this Agreement as soon as feasible.  If a force majeure event causes a material failure or delay in the performance of any Services for more than five (5) consecutive days, PAREXEL may, at its option, and in addition to any other rights PAREXEL may have, procure such Services from an alternate source until ZTD is again able to provide such Services, and ZTD shall be liable for all payments made and costs incurred by PAREXEL required to obtain the Services from such alternate source during such period.  PAREXEL shall not be required to pay for Services not delivered due to a force majeure event.  PAREXEL may terminate at its option the whole or any part of any SOW if such a situation continues for at least fifteen (15) days, and if PAREXEL elects a partial termination, the provisions of this Agreement related to SOW termination shall apply to the part of the SOW terminated.  PAREXEL may elect additional terminations, in whole or in part, for as long as the situation continues.

(e)   Entire Agreement.  This Agreement and all attachments thereto (including without limitation all SOWs referencing this Agreement) shall constitute the complete agreement between the parties and supersedes all previous agreements or representations, written or oral, with respect to the Services described herein.  This Agreement may be executed in multiple originally signed versions which together shall constitute one agreement.  A facsimile signature shall have the same force and effect as an original signature.  This Agreement may not be modified or amended except in a SOW or other writing signed by the parties.

(f)   Survival.  The provisions of this Agreement or any SOW which give the parties rights beyond the termination or expiration of this Agreement or such SOW shall survive such termination or expiration, including without limitation, the sections titled Term and

Termination, Nondisclosure, Intellectual Property, Limitations on Liability, Indemnification, Fees, Dispute Resolution, and Miscellaneous.

      (g)   Invalidity.  If any provision of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement as a whole, but this Agreement shall be construed as though it did not contain the particular provision or provisions held to be invalid or unenforceable.

      (h)   Waiver.  No waiver shall be deemed to be made by any party of any of its rights hereunder unless the same shall be in a writing signed by the waiving party, and any waiver shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights or the obligations of any party in any other respect at any other time.

      (i)   Headings.  Section headings herein are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

      (j)   Notices.  All notices, including notices of address change, required to be sent hereunder shall be in writing and shall be deemed to have been given when mailed by overnight delivery, when faxed with confirmation of transmission or when delivered by hand (i) if to PAREXEL, the VP, WW Procurement and Travel at 900 Chelmsford Street, Suite 310, Lowell, MA  01851, with a copy to: General Counsel, at 200 West Street, Waltham, Massachusetts 02451, or (ii) if to ZTD, to the ZTD Project Manager at 360 Lexington Avenue, Suite 1100, New York, NY 10017, with a copy to Anand Mitkari, at 1415 W 22nd Street, Suite 925, Oak Brook, IL 60523.

**IN WITNESS WHEREOF**, the parties hereto have entered into this Agreement as of the Effective Date.

ZENSAR TECHNOLOGIES LIMITED

By: _____

Print Name: Joseph Ung
Title: Vice President

Date: June 25, 2008

PAREXEL INTERNATIONAL, LLC

By: _____

Print Name: _____ James F. Winschel Jr.
Treasurer

Title: _____

Date: _____ 7 - 2 - 08



**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ZENSAR TECHNOLOGIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| PAREXEL INTERNATIONAL LLC | ) |
| | ) |
| Defendant. | ) |
| -------------------------------------------------- | ) |

**Exhibit B**

# Statement of Work

## Oracle  COA Redesign, 11.5.10 Project Costing & Billing Implementation, Upgrade to R12, R12 Purchasing & iProcurement Implementation

This Statement of Work No. One forms a part of and is subject to that certain Master Services Agreement by and between Zensar Technologies Limited ("ZTD") and PAREXEL International, LLC ("PAREXEL") dated as of June 25, 2008  (the "Agreement").  This document constitutes a SOW as defined in the Agreement.  Capitalized terms not otherwise defined herein shall have the meaning assigned in the Agreement. The commencement date of this SOW shall be June 27,2008 ("Commencement Date").

This SOW shall have an initial  term of 24 months pursuant to the project timeline defined in this SOW.

# Contents

1   Executive Summary ................................................................................................ 3

2   Scope ...................................................................................................................... 4

    2.1   Scope Detail                                                          4

    2.2   Workplan     19

    2.3   Training and Knowledge Transfer     21

    2.4   Data Migration Strategy     21

3   Roles & Responsibilities ...................................................................................... 23

    3.1   Overview     23

    3.2   Travel Arrangements     28

4   Pricing ................................................................................................................... 29

5   Project Assumptions ............................................................................................ 30

    5.1   General Assumptions     30

    5.2   PAREXEL Obligations     35

    5.3   Functional Assumptions     36

    5.4   Technical Assumptions     38

# 1  Executive Summary

ZTD is pleased to present the following proposal for Oracle Chart of Accounts Redesign, 11.5.10 Project Costing & Billing, Upgrade to R12, and R12 Purchasing & iProcurement Implementation services (the "Project") to PAREXEL.

A ZTD team has carefully studied PAREXEL's requirements, and has prepared a **competitive** and **compelling** response to PAREXEL's business needs. We are confident in our ability to successfully implement this new Oracle Project and we are fully committed to achieving PAREXEL's business and technical objectives on time and within budget.

This SOW details the services ZTD will provide based on the requirements contained herein and included in the RFP, issued March 28, 2008 and in the Question & Answer documents provided by PAREXEL on April 10, 2008 and April 15, 2008, and ZTD's responses to the RFP. The above referenced documents are incorporated by reference to this Statement of Work.

## 2  Scope









| Feed# | Type | From System | Responsible | InTo System | Responsible | Description |
|-------|------|-------------|-------------|-------------|-------------|-------------|
| 15 | | | | | | |
| 16 | | | | | | |
| 17 | | | | | | |
| 18 | | | | | | |
| 19 | | | | | | |
| 20 | | | | | | |
| 21 | | | | | | |
| 22 | | | | | | |
| 23 | | | | | | |
| 24 | | | | | | |
| 25 | | | | | | |
| 26 | | | | | | |
| 27 | | | | | | |
| 28 | | | | | | |
| 29 | | | | | | |
| 30 | | | | | | |
| 31 | | | | | | |





| Feed# | Type | From System | Responsible | InTo System | Responsible | Description |
|---|---|---|---|---|---|---|
| 32 | | | | | | |
| 33 | | | | | | |
| 34 | Oracle API | | | | | |
| 35 | Oracle API | | | | | |
| 36 | Oracle API | | | | | |
| 37 | Oracle API | | | | | |
| 38 | Oracle API | | | | | |
| 39 | Oracle API | | | | | |
| 40 | Oracle API | | | | | |
| 41 | Oracle API | | | | | |
| 42 | Oracle API | | | | | |
| 43 | Oracle API | | | | | |
| 44 | Oracle API | | | | | |
| 45 | Oracle API | | | | | |
| 46a | | | | | | |
| 46b | | | | | | |
| 47 | Oracle API | | | | | |

Confidential



| Feed# | Type |
|-------|------|
| 48 | |
| 49 | |
| 50 | |
| 51 | |
| 52 | |
| 53 | |
| 54 | |
| 55 | |
| 56 | |
| 57 | |
| 58 | |
| 59 | |
| 60 | |
| 61 | |
| 62 | |
| 63 | |
| 64 | |
| 65 | |
| 66 | |
| 67 | |
| 68 | |
| 69 | |
| 70 | |

| Feed# | Type | From System | Responsible | InTo System | Responsible | Description |
|-------|------|-------------|-------------|-------------|-------------|-------------|
| 71 | | | | | | |
| 72 | | | | | | |
| 73 | | | | | | |
| | | | | | | |
| A | | | | | | ually |
| B | | | | | | or |
| C | | | | | | r BO, |
| D | | | | | | r BO, |
| E | | | | | | r BO, |
| F | | | | | | ices, |

### 2.1.1  Reporting

PAREXEL intends to use the reports delivered with the Oracle applications ███████████ ████████████████ The scope of work assumes 20 custom reports of average complexities will be developed.   Reports shall be written with comparable options such as XML, XBRL, HTML, or Spreadsheet outputs.

The analysis and design phase should focus on how to achieve improved reporting functionality by eliminating manual reporting and improving the timeliness, accuracy, and sharing of data in the financial reporting area.   Oracle Self service and/or web based reporting options will be considered.

### 2.1.2  Data Conversion

All open active projects at the time of production cut-over and other data (project and non-project related) as required by statutory or regulatory requirements will need to be converted.   A detailed analysis of the data conversion requirements will be conducted during the design phase.

### 2.1.3  Training and Documentation

A training needs analysis will be conducted during the design phase of the project to determine what training is required.

A Training Needs Analysis document will be prepared to cover the following:

- Who requires training?

- What must they be trained on?

- What method(s) will be used to provide the training?

- Who will provide the training?

At this point, the full training program can not be determined.  A train-the-trainer approach will be utilized coupled with leveraging the UPK tool, for the most effective training methodology.

## 2.1.4  Project Activities

A joint ZTD and PAREXEL team will support the defined work effort.  This joint team approach will support PAREXEL through the entire Oracle effort.  The teams will work collaboratively in the following areas:

Project Management:

- Develop Detailed Work Plan with timeline, key milestones, and resource estimates.

- Coordinate, oversee, and co-manage the overall project. Including Project Status Reporting, Issue/Risk Management, and Change Request Management

Functional:

- ██████████████████████████████████████████
  ██████████████████████████████████████

- ████████████████████

- ██████████████████████████████████████████
  ████████████████████████

- ██████████████████████████████████████████
  ████████████████████████████████████
  ██████████████████████████████████████████

- ████████████████████████████

- ████████████████████████████████

- ████████████████████████





| PHASE | DELIVERABLE | RESPONSIBILITY | |
|---|---|---|---|
| | | PAREXEL | ZTD |





## 2.1.5  Project Deliverables

Upon completion of this effort, PAREXEL will have received the following key deliverables, which will have been jointly developed and managed by a ZTD consultant and the respective PAREXEL resource. All deliverables are led by ZTD unless otherwise stated.





## 2.2    Workplan

The first phase of the Oracle COA Redesign, Project Costing & Billing, Upgrade to R12, and Purchasing & iProcurement System Implementation project is anticipated to start on July 7, 2008, and be completed on June 7, 2010.



**High level Milestones**

| Key Milestone | Date |
|---|---|
| ██████████████ | ██████ |
| ████████████████ | ██████ |
| ██████████████ | ██████ |
| ████████████████████ | ██████ |
| █████████████████████ | ██████ |
| ████████████████████████ | ███████ |
| ██████████ | ██████ |
| ██████████████ | ██████ |
| ████████████████████ | ██████ |
| █████████████████████ | ██████ |

## 2.3    Training and Knowledge Transfer

The training approach deployed will include the following elements:

- *Training Team:* A training team will be assembled to include a combination of ZTD consultants and PAREXEL employees. This team will be responsible for preparing the training materials, coordinating the sites and delivering the classes.

- *Site Support:* In addition to training end users, we would suggest the launch of a 'Level 1 Site Support' program. This program will identify and prepare individuals as 'Site Champions', through specialized training so they can assist co-workers on a daily basis. The objective being that by establishing 'Level 1 Site Support', we will eliminate unnecessary calls to the help desk.

- *Training Materials:* A training manual will be compiled by the training team and provided to all attendees. The training team will also assemble and distribute quick reference guides for commonly used functionality. ZTD will work closely with PAREXEL country leads to incorporate country specific material where applicable.

- *UPK:* UPK will be used to record procedures, PAREXEL specific business processes, thereby creating a PAREXEL centric training system flow. Combinations of recorded procedures will be used to output a custom training guide for the PAREXEL user audience. Instructor notes and challenge exercises can be added to create a complete training solution for the classroom.

This approach will not include any special training for Help Desk personnel, but they will be included in the training provided to the end users. In addition, we assume that training classes for System Administrators, Database administrators and Application Support staff will be provided internally or by Oracle.



## 3   Roles & Responsibilities

### 3.1   Overview

ZTD will provide resources to cover the following roles required throughout the program:

- Program Manager



ZTD will promptly replace any employee of ZTD or its subcontractors who PAREXEL determines to be incompetent, careless, unsuitable or otherwise objectionable.  PAREXEL has the right to approve the appointment and replacement of personnel filling these positions, including the project manager.

PAREXEL have indicated 4 Technical resources and 3 functional support resources that will be available for 60% of their time. In addition to these resources we recommend a full time project/program manager, a full time lead business resource for each stream with further involvement from subject matter experts from each SBU/location. Project time for these business users will be approximately 15-20% of their time spread across the duration of the project. Executive involvement including project sponsor, project board members and project steering group would be required. These details will be finalized during Project Initiation detailed planning.

The following table shows Roles and Responsibilities for project resources:



| Role | Responsibility |
| --- | --- |
|  |  |



| Role | Responsibility |
|------|----------------|



| Role | Responsibility |
|------|----------------|





## 3.2   Travel Arrangements

### 3.2.1   On Site Work Schedules

Our consultants who travel to the site at Lowell, MA will typically work on site from Monday – Thursday and from local ZTD offices or home office on Fridays. Local consultants will work on site from Monday through Friday.

### 3.2.2   Resource Location

ZTD has a national Oracle consulting practice with headquarters in New York City, NY. ZTD believes in utilizing the most experienced resources to deliver the highest quality work to our clients. Where possible, ZTD attempts to staff client engagements with local talent. However the overriding criteria for staffing resources will be on staffing consultants with the most relevant experience to meet the client's requirements.

## 4  Pricing

ZTD's professional fee estimate is based on the scope of work and assumptions documented in this proposal.   During the design phase ZTD will invoice PAREXEL once a month. Each invoice will include a detailed breakdown of costs. The billing terms of the "build, test, training and deployment" phase will be determined at the conclusion of the analysis and design phase.





| Resource Type | Testing | Off-shore Tech | Off-shore Func | UPK | Func Lead/ Func Consultant/ DBA | Tech Lead | Project Mgr/ Program Mgr/ Architect | Total Hours Check |
|---|---|---|---|---|---|---|---|---|
| ▇▇▇▇ | | ▇ ▇ | | | | | | |
| ▇▇▇ | | ▇ ▇ | | | | | | |
| ▇▇▇ | | ▇ ▇ | | | | | | |

The total price quote of **$4,083,524** for the implementation of the following:

- Oracle Chart of Accounts (COA) Redesign
- Oracle 11.5.10 Project Costing & Billing
- Upgrade of Oracle 11.5.10 to R12
- Oracle R12 Purchasing & iProcurement

ZTD professional service fees for the analysis and design work for all 4 tracks will be charged on a time and material basis with a not to exceed amount of **$1,158,004.** This amount is made up of the estimated budget of $1,006,960 and a cap of 15%, or $151,044. The time and material estimate for the remaining build, test, training and deployment for all 4 tracks is **$2,925,520.** At the end of the Analysis and Design phase for each track, PAREXEL and ZTD will fix price the fee for the Build, Test, Training, and Deployment work based upon the agreed upon scope of work as defined during the Analysis/Design phase for that track.

In addition, reasonable and customary non-labor related expenses will be invoiced at actual. We will cap the expenses at 15% of the overall project fees. All expenses must be approved by PAREXEL in advance.

# 5   Project Assumptions

## 5.1   General Assumptions

1. PAREXEL will provide office facilities for ZTD consultants, such as cubicles, project meeting room, telephones, connectivity (VPN access for off-shore consultants and off-hour access for on-site consultants), and email.

2. ZTD and PAREXEL project team will be jointly responsible for identifying and resolving issues. Issues will be resolved within three (3) business days from their initial identification, or on a mutually agreed-on schedule based on priority.,

3. All deliverables will be submitted for review to PAREXEL Project Management upon completion. PAREXEL will have five business days to review the deliverables and document modifications as required. PAREXEL will be required to sign off on deliverables ("deliverables acceptance"). If no modifications have been documented after five business days of submission, the deliverable will be considered accepted.

4. PAREXEL shall have the right to review any in-progress or completed code, configuration, or documentation and request modifications if shortcomings are identified.   Rework activities not caused by PAREXEL will not be charged to PAREXEL.   PAREXEL will own all modified code upon completion of this project.

5. Any project delays, caused by factors beyond the control of ZTD, will be handled through ZTD's standard Change Order process, which requires sign-off by PAREXEL and a ZTD Engagement Partner.

6. ZTD will make full use of Oracle standard functionality to meet all PAREXEL requirements. Any unmet requirement that must be addressed via enhancements and/or customizations is out-of-scope of this engagement and will be addressed via the change order process or during the fixed-bid process of for each implementation phase.

7. Any additions to the scope of work detailed in this proposal will be handled through ZTD's standard Change Order process, which requires sign-off by PAREXEL and a ZTD Engagement Partner.

8. PAREXEL operates with Standard Oracle workflows.  Any customization to workflows identified during the design phase will be incorporated into the functional specifications and addressed during the fixed-bid process for each track as applicable.

9. PAREXEL will provide the System Administrator support for Operating System.

10. The Production down time will be agreed upon mutually.   Every effort will be made to minimize down time and appropriate risk mitigation efforts established.

11. PAREXEL will provide test scenarios and Test Data. PAREXEL is responsible to put the data files at appropriate locations for each iteration of testing. ZTD will develop and/or modify applicable standard test scripts based on the test scenarios and test data provided.

12. Users will be available for UAT at a given location.

13. PAREXEL will facilitate any support escalation with Oracle.  ZTD will assist PAREXEL in logging and following up TARs and obtaining resolutions from Oracle.

14. Access to PAREXEL work premises will be provided where delivery work will be conducted.  Workstations and equipment are expected within the facility provided.

15. Appropriate hardware, software and facilities resources will be provided by PAREXEL, to enable the completion of the engagement.

16. Should additional travel outside of main PAREXEL facilities in MA be required, ZTD will charge PAREXEL the actual costs incurred during such trips in addition to the project costs.  Travel shall be in accordance with PAREXEL's standard travel policy.

17. PAREXEL will retain the responsibility of generic system and network administration and the server.

18. PAREXEL will provide a separate hardware/software environment setup for upgrade database instances.

19. PAREXEL resources are expected to be available to the project as per the resource plans, which shall be discussed with the PAREXEL project manager on a regular basis.

20. ZTD will not be held accountable for the impact to the project time line directly resulting from any software bug resolution and / or non-availability of appropriate hardware resources

21. Testing will cover all countries and not US set up only.

22. PAREXEL is responsible for upgrade, integration and testing of all the 3rd party systems.

23. PAREXEL will be responsible for coordinating and resolving issues which require input from PAREXEL's business resources.

24. Issues will be jointly reviewed and managed by the PAREXEL and ZTD team members.

25. PAREXEL has a full time Project Manager for the duration of the project covering all four tracks.

26. ZTD will be involved in all decisions which impact the project direction, resources, scope and timeline.

27. ZTD consultants who travel to project site will be on-site Monday – Thursday and work remotely on Fridays with the exception of critical activities that might be required to take place on Fridays in which case the ZDT team will have appropriate coverage on-site.

28. PAREXEL would provide all as-is business process flows for Purchasing and Projects Costing and Billing.

29. ZTD will be responsible for developing UPK based training material.

30. ZTD will adopt "train the trainer" approach and to support PAREXEL lead users to prepare and train the end users.

31. PAREXEL will deliver training to end users.

32. Any change in timeframe is considered a change in scope and subject to the change order process with the exception of changes resulting from delays within control of ZTD.

33. Two CRP's (conference room pilots) are planned for both the Purchasing and Projects Implementations. CRPs should be planned for ALL tracks..

34. A dedicated team of assigned Key Users/ Project Champions with commitment and support from PAREXEL Project board / Management.

35. Hardware/software, license etc., required to execute the project would be procured by PAREXEL.

36. The estimated timelines and schedule mentioned in the proposal are indicative and may change based on findings in project analysis and design phase.

37. PAREXEL Project Team Members (Functional and Technical) have a clear understanding of their current business operations and of the future state vision.

PAREXEL finance subject matter expert (SMEs) should have clear understanding of local statutory requirements.

38. In addition to PAREXEL super users, PAREXEL will provide an appropriate number of staff to participate in the project in areas that require their assistance, guidance and advice.

39. ZTD will not be held accountable for the impact to the project time line directly resulting from product bug resolution. However, ZTD will fully assist to raise Technical Assistance Requests (TARs) with Oracle and follow up the TARs to obtain resolutions from Oracle.

40. PAREXEL will be responsible for the generic system and network administration of their server(s). ZTD assumes that the required application environments are available on a timely basis, as agreed upon in the project plan.

41. ZTD would be responsible to prepare high level test plans, whereas the detailed test cases would be the responsibility of PAREXEL.

42. PAREXEL project team members should also be responsible to conduct Testing as per plan in different phases and give objective feedback to ZTD within 1 day of completion of Testing.

43. Any planned downtime will be communicated to ZTD Project Manager

44. Post production DBA support will be PAREXEL responsibility and not considered in scope.

45. Deployment of the applications has been estimated based on a big bang approach where all countries and locations are taken live at the same time.

46. ZTD will provide the necessary resources post-production to insure that all systems are operating as expected. ZTD will provide support during the first week of production cut-over and the first week of month-end close.

## 5.2   PAREXEL Obligations

1.  PAREXEL management will be available to review and provide timely approval of project milestones.

2.  PAREXEL business users will be available for discussions relating to business requirements.

3.  PAREXEL will make resources available for this project based on the resource plan presented in the proposal.

4.  PAREXEL will provide a dedicated project manager for the life of the project.



6.  Design decisions will be made within 5 business days to ensure on-time and on-budget delivery of the project.  PAREXEL will be responsible for coordinating and resolving issues that require input from PAREXEL's senior management.

7.  PAREXEL is responsible for internal communications and change management associated with the implementation

8.  PAREXEL will be responsible for management of any third-party relationships, including vendors and outside service providers.

9.  All the following previous implementation documents should be made available to ZTD:



- Functional design for Reports and Forms

## 5.3    Functional Assumptions

1.  ZTD will be involved in all decisions that impact the project direction, resources, scope and timeline.

2.  PAREXEL is responsible for extraction of conversion data in machine readable format and for any all scrubbing of the data prior to loading. Additionally, PAREXEL will perform reconciliation of all converted data.

3.  ZTD and PAREXEL will agree on the composition of an appropriate Steering Committee that will meet on a regular basis during the implementation to discuss progress and satisfaction levels.

4.  ZTD and PAREXEL project managers will define the control and reporting procedures to be used throughout the project within the first two weeks of the engagement.  ZTD will provide PAREXEL project management financial and status reports on a weekly basis.  Status reports will contain at a minimum, time spent and time remaining, budget, milestones, open issues and risks.  Project plans and/or work plans will be updated in detail at least every two weeks to indicate task completion, man-days expended by task, and man-days remaining by task.

5



6.  ZTD will identify and support leveraging new features

7.  PAREXEL has existing test scripts with specified test scenarios and test data. ZTD will develop automated test scripts based on these test scenarios and test scripts.

8.  There are some ad-hoc user manuals which exist.

9.



10. All other business users and Subject Matter experts (SME's) across different geographies and business units will be available to the project team in a timely fashion for discussion and decision making.

11. All business decisions and sign-offs would be completed in no more than 5 business days.

12. PAREXEL has agreed to adhere to standard business processes for purchasing and Projects across the different geographic regions and various lines of businesses. Except where localizations are required due to legal local restrictions.   There is some level of customization that will be required as identified in the RFP and Business Requirements and are expected to be clarified during the design phase.

13. ████████████████████████████████████████████
████████████████████████████

14. There are no customizations to Purchasing and Projects Implementation other that required for Purchasing and Projects extension and existing interfaces.  There is some level of customization that will be required as identified in the RFP and Business Requirements and are expected to be clarified during the design phase.

## 5.4



11. PAREXEL will have a team of technical resources to support the project. The exact number would be validated during project initiation phase. We would expect at least 2 FTE equivalents in terms of technical resources for the duration of the project.

12. We are sharing one on-site technical lead through out all four tracks

13. PAREXEL will maximize Standard Oracle workflows and minimize the level of customizations for this upgrade.   There is some level of customization that will be required as identified in the RFP and Business Requirements and are expected to be clarified during the design phase

Signature below indicates acceptance of this Statement of Work.

| PAREXEL INTERNATIONAL, LLC. | | Zensar Technologies Limited | |
|---|---|---|---|
| Signature: | _James F. Winschel_ | Signature: | _Joseph Ung_ |
| Name: | ~~James F. Winschel Jr.~~ Treasurer | Name: | Joseph Ung |
| Title: | | Title: | Vice President |
| Date: | 7-2-08 | Date: | June 25, 2008 |

52493.000506 RICHMOND 2116555v2

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MASSACHUSETTS**

ZENSAR TECHNOLOGIES, INC.,     )
                             )
         Plaintiff,         )
                             )
                             )
v.                            )
                             )
PAREXEL INTERNATIONAL LLC    )
                             )
         Defendant.      )
----------------------------------------------------- )

**Exhibit C**

AMENDMENT No. 1
To Statement of Work Dated July 1, 2008 ("Agreement")
Between PAREXEL International, LLC ("PAREXEL") and
ZenSar Technologies Limited ("CONTRACTOR")

This Amendment to the Statement of Work is effective this 7/1 day of April 2010 ("Effective Date") by and between PAREXEL and CONTRACTOR.

WHEREAS CONTRACTOR is performing certain system development and implementation services under the Agreement pursuant to the Statement of Work entitled "Oracle Redesign 11.5.10 Project, Costing & Billing Implementation, Upgrade to R12, R12 Purchasing and i-Procurement Implementation" dated July 1, 2008(the "Original SOW");

WHEREAS, the parties desire to amend the Original SOW by (i) fixing the amount owed for work done to date under the Original SOW , (ii) providing additional detail and expanding the scope of work to be performed by CONTRACTOR, and (iii) providing for a fixed price and schedule for the performance of the remaining work under the SOW.

WHEREAS, the parties desire to effectuate the foregoing as stated herein.

NOW, THEREFORE, in consideration of the mutual promises contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree to amend the Original SOW:

1.    Section 2 ("Scope") of the Original SOW is modified by adding the following;

I.    **Scope of Work**

A.         **Services and Deliverables**

CONTRACTOR shall perform the services and provide deliverables as follows:

a. As stated in Attachment A - "Critical Functionality". This document references the approved requirements documents and extension/customization MD-50s that specify the requirements to be delivered relative to these activities. Requirements include functional mapping to standard Oracle features or identification of customization needs and the implementation approach and solutioning.

b. As stated in Attachment B (containing a listing of the customization requirements ("MD-50/70s") that have been approved by PAREXEL and describe the functional and technical needs for each approved customization.

c. As stated in Attachment C (containing a listing of the BR100 agreements which documents the configuration and setup of the system as approved by PAREXEL).

d. As stated in Attachment D (containing a listing of the CV200 agreements that document the conversion processes and validation criteria).

e. As stated in Attachment E (containing a listing of PAREXEL Business Requirements documents that are the basis of – CONTRACTOR's design solutioning).

CONTRACTOR will provide the necessary Go-Live and post-production resources to ensure that all systems are operating in accordance with the Quality Acceptance outlined in Section III hereof and to support the resolution of reported systems issues. CONTRACTOR will provide support during the 30

days after production cutover including the July 2010 close.

**B.**        **Project Schedule**

| Key Project Activities | End Date |
|---|---|



**C.**        **Project Managers and Third Party Contractors (if applicable):**

"

For purposes of this SOW amendment, the following are the named project managers:

PAREXEL:    Christine Kiezulas

CONTRACTOR:  Barry Brown

Engagement by CONTRACTOR or replacement of any third party contractor requires full consultation with the PAREXEL Project Manager.  CONTRACTOR acknowledges that it is on a deliverables-based payment arrangement and is responsible and accountable for its own resources that are deployed to complete the project.  CONTRACTOR will on a best-effort basis seek the concurrence from PAREXEL Project Manager on consulting resources.

**D.**        **Contractor Resources**

CONTRACTOR will utilize the key resources identified in Attachment F to complete the Project Deliverables within the agreed upon Schedule and Quality Acceptance criteria outlined in Section III hereof.  CONTRACTOR will add/modify/subtract resources as required, subject to the provisions of I.C. above, to fulfill its obligations.  CONTRACTOR agrees to provide PAREXEL with no less than 30 days notice of any planned change in key resources identified in Attachment F.

**E.**        **Changes in Scope**

Any changes to the project scope shall be agreed upon in writing as defined below.  CONTRACTOR shall have no liability whatsoever for slippages in the schedule timeline caused by factors beyond the

control of CONTRACTOR. For each change in scope PAREXEL shall generate and maintain a Change in Scope Log ("CIS Log") in accordance with and in the form set forth in Attachment G showing all changes to the activities to be provided under this SOW Amendment. When there is a new entry, PAREXEL shall forward the CIS Log to CONTRACTOR and CONTRACTOR shall review the CIS Log and request any changes in writing within 5 business days of receipt of the CIS Log.

The authorized representatives below will approve and sign-off on new entries in the CIS Log within 5 business days or earlier as deemed necessary. Upon sign-off the amended scope will be binding on both parties and shall be implemented.

PAREXEL: _Gerald Herman, Corporate VP and Controller_

CONTRACTOR: _____Chakri Reddy, AVP_____

Once the total amount of the CIS Log reaches a threshold of $10,000, then a formal Change Order will be prepared in accordance with and in the form set forth in Attachment H and signed by both parties. A Change Order will be prepared irrespective of the threshold at the end of the project. In no event will PAREXEL be obligated to pay for any changes in scope in excess of $10,000 in the aggregate in the absence of an executed Change Order.

For purposes of Change in Scope approval, the following are the named approvers:

PAREXEL: _James F. Winschel, Sr. VP & CFO_____

CONTRACTOR: _____Chakri Reddy, AVP_____

2. Section 4 ("Pricing") of the Original SOW is deleted and replaced with the following:

## II.     Fees and Expenses

### A.     Payment for Work to Date

Within 10 days of the Effective Date, PAREXEL shall pay CONTRACTOR $630,217 for all work performed under the Original SOW and upon such payment, notwithstanding anything to the contrary contained in the Original SOW or any outstanding PAREXEL purchase order or CONTRACTOR invoice, PAREXEL shall owe CONTRACTOR no further amounts under or by reason of the Original SOW and CONTRACTOR expressly releases PAREXEL from any claim with respect thereto.

### B.     Fees and Expenses for Services under this SOW Amendment

For the period January 1, 2010 through Post-Production Go-Live Support (currently expected through August, 2010), the parties have agreed to a deliverables-based payment arrangement, each deliverable subject to the quality conditions described in Section III hereof.

PAREXEL shall pay CONTRACTOR a fixed amount of $3,200,000 (the "Fixed Fee"), including fees and all expenses, for the services and deliverables of this SOW Amendment. A Quality Incentive, subject to specific quality conditions described below, of $500,000 is also available to CONTRACTOR under this arrangement, provided the CONTRACTOR meets all of the criteria specified. Subject to acceptance of each Gate by PAREXEL as provided herein, the Fixed Fee and Quality Incentive shall be payable as follows:

| Gates | Condition | Total Amount[1] | Delivery Date |
|-------|-----------|----------------|---------------|
| I. Development Work Complete | Deliverables[2] | | April 15 |
| II. Completion of UAT | Deliverable[3] | | June 15 |
| III. Limited Production Cutover (Go-Live) | Deliverables[4] | | July 12 |
| IV. Full Production Cutover (Go-Live) | Deliverables[5] | | July 21 |
| V. Quality Incentive | Deliverables[6] | | Sept. 20 |

*1 – Total Amount represents professional fees and all expenses.*

*2 – Deliverables include completion of all system development work as specified in Attachments A-E, including standard functionality, interfaces, customizations, and reports by CONTRACTOR, together with successful quality acceptance by the PAREXEL Project team in accordance with the quality acceptance section defined herein and the requirements documents included herein as Attachments A-E.*

*3 – Deliverables include complete Critical system functionality, as defined in Attachment A, operating in accordance with requirements and customizations as assessed by the PAREXEL Project team, and accepted by the Delivery Date. Critical functionality is subject to the quality conditions described in Section III hereof, which specify that Critical functions with Severity Level 1 or 2 conditions will not qualify as acceptable quality functionality. In addition, functions with Severity Level 3 conditions will require mutually agreed upon workarounds and fix timelines for PAREXEL to consider these Critical functions as operating.*

*4– Critical system functionality for A/P, A/R, and Procurement, as defined in Attachments A-E, shall be placed in production and shall work in accordance with the requirements specified in such Attachments by the Delivery Date. In the event of problems with such system functions, such problems shall be categorized in accordance with the Severity Level table in Section III below and resolved within the timelines specified for such Severity Levels in Section III, all by the Delivery Date.*

*5 – Complete Critical system functionality defined in Attachments A-E shall be placed in production and shall operate in accordance with requirements specified in such Attachments by the Delivery Date. In the event of problems with such system functions, such problems shall be categorized in accordance with the Severity Level table in Section III below and resolved within the timelines specified for such Severity Levels specified in Section III, all by the Delivery Date.*

*6- Deliverables include complete Critical system functionality defined in Attachment A operating in accordance with requirements defined herein as assessed by the PAREXEL Project team, as well as all Critical functionality in Attachment A not experiencing any Severity Level 1, 2, or 3 conditions all accepted by the Delivery Date.*

CONTRACTOR will not be held accountable for items or tasks over which it does not exercise control, including but not limited to, for example, Oracle software bugs and PAREXEL hardware or software issues which impact instance availability.

This Statement of Work does not contemplate partial payments under the key implementation gates I-IV described above. Payments will be made to CONTRACTOR by PAREXEL within 45 days after all deliverables under that implementation Gate have been delivered and accepted by PAREXEL as stated above. Time shall be of the essence with respect to the Delivery Date for each Gate.

### III.    Quality Acceptance

CONTRACTOR is responsible and accountable for delivering critical system functionality in accordance with this SOW Amendment.   In addition, at each of the following key system implementation gates:

- o   Completion of UAT
- o   Limited Production Cutover (Go-Live AP/AR/Procurement)
- o   Full Production Cutover (Full Go-Live)

PAREXEL will assess the quality of "functionality" in accordance with the quality acceptance criteria defined below.

#### Service Request Severity Level Assignment Definitions

| Severity Level | Severity Level Assignment Definition |
|---|---|
| Level 1 | Critical Business Impact.  The problem causes complete loss of service for the environment.  Work cannot reasonably continue, the operation is mission critical to your business, and the situation is an emergency. A severity Level 1 problem has one or more of the following criteria:<br><br>• Data Corrupted<br><br>• A crucial function is not available or malfunctions.<br><br>• System hangs indefinitely, causing unacceptable or indefinite delays for resources or response<br><br>• System crashes, and crashes repeatedly after restart attempts |
| Level 2 | Significant Business Impact.  Incidents that result in part of the environment being down causing severe loss of service.  No acceptable workaround is available; however, business operations in the environment can continue to be conducted in a restricted manner. |
| Level 3 | Some Business Impact.  The problem causes minor loss of service for the environment.  The impact is an inconvenience, which may require a workaround to restore functionality. |
| Level 4 | Minimal Business Impact.  The problem causes no loss of use of the Applications environment.  The result is a minor error, incorrect behavior, or a documentation error that does not impede the operation of the system within the Application environment. |

Each deliverable (i.e. those listed under the critical functionality matrix in Attachment A) will be subject to the quality acceptance criteria defined above.  These deliverables will move through several gates. Gate I is where CONTRACTOR submits a completed customization or functional operating deliverable. PAREXEL will test each deliverable to determine if it meets the requirements defined in Attachments B, C, and D.  During Gate II (completion of UAT) each deliverable will be retested to ensure it functions as required and determine if it integrates with other deliverables and operates as prescribed with end-to-end

processes. Written test scripts will include module-specific, integrated (operating between modules), and end-to-end (following data as it enters the system to its end state) testing activities.

Deliverable functions with Severity Level 1 or 2 conditions will not be considered acceptable quality to PAREXEL. CONTRACTOR will analyze and work to resolve Level 1 and 2 conditions within 24 and 72 hours respectively. Functions with Severity Level 3 conditions will require mutually agreed upon workarounds and fix timelines for PAREXEL to consider these functions as operating.

Each of the deliverables defined in Section I. A. will be subject to quality acceptance testing by PAREXEL as specified herein. Upon completion of any Deliverable, CONTRACTOR will submit the Deliverable together with a complete copy thereof to PAREXEL in accordance with the requirements for Work Product defined in the Master Services Agreement. CONTRACTOR will demonstrate to PAREXEL the functionality of the Deliverable. PAREXEL shall be responsible for any additional review and testing of such Deliverable in accordance with any applicable acceptance criteria and test suites, provided that CONTRACTOR shall provide reasonable assistance in connection with such test as requested by PAREXEL. If a submitted Deliverable does not perform according to the functional requirements specified for such Deliverable in this Amendment and the acceptance test developed therefore, PAREXEL shall have fifteen (15) calendar days after CONTRACTOR's submission of the Deliverable ("Acceptance Period") to give written (including email) notice thereof to CONTRACTOR specifying the deficiencies in detail. CONTRACTOR shall cure any such deficiencies within 24 and 72 hours for Severity Level 1 or 2 conditions and within ten (10) calendar days of notification of Severity Level 3 or 4 conditions. After completing any such cure, CONTRACTOR shall resubmit the Deliverable for review and testing as set forth above. Upon accepting any Deliverable submitted by CONTRACTOR, PAREXEL shall provide to CONTRACTOR a written acceptance of such Deliverable. Notwithstanding the foregoing, if PAREXEL fails to reject any Deliverable within the Acceptance Period in the manner described above, such Deliverable shall be deemed accepted at the end of the Acceptance Period.

3. To the extent of any conflicts between this Amendment and the Original SOW, this Amendment shall control.

4. Except as otherwise expressly stated or modified herein, the Agreement and Original SOW shall remain in full force and effect.

**ACCEPTED AND AGREED TO:**

**PAREXEL International, LLC**                    **ZenSar Technologies, Limited**

By: _James F. Winschel_                           By: _____

Name: _James F. Winschel Jr._                     Name: _____
         Treasurer

Title: _____                    Title: _____



Attachment A:

**OCB CRITICAL FUNCTIONALITY ASSESSMENT**
(7 April 2010)

| Module | No. | Functionality | CONTRACTOR Custom # | Requirements | Type | Status | Priority |
|--------|-----|---------------|---------------------|--------------|------|--------|----------|
| | | | | | | | |

Confidential

OCB CRITICAL FUNCTIONALITY ASSESSMENT
(7 April 2010)

| Module | No. | Functionality | CONTRACTOR Custom # | Requirements | Type | Status | Priority |
|--------|-----|---------------|---------------------|--------------|------|--------|----------|
| | | | | | | | |

**OCB CRITICAL FUNCTIONALITY ASSESSMENT**
**(7 April 2010)**

| Module | No. | Functionality | CONTRACTOR Custom # | Requirements | Type | Status | Priority |
|--------|-----|---------------|---------------------|--------------|------|--------|----------|
| | | | | | | | |

## OCB CRITICAL FUNCTIONALITY ASSESSMENT
### (7 April 2010)

| Module | No. | Functionality | CONTRACTOR Custom # | Requirements | Type | Status | Priority |
|--------|-----|---------------|---------------------|--------------|------|--------|----------|
| | | | | | | | |

## OCB CRITICAL FUNCTIONALITY ASSESSMENT
### (7 April 2010)

| Module | No. | Functionality | CONTRACTOR Custom # | Requirements | Type | Status | Priority |
|--------|-----|---------------|---------------------|--------------|------|--------|----------|
| | | | | | | | |

## OCB CRITICAL FUNCTIONALITY ASSESSMENT
### (7 April 2010)

| Module | No. | Functionality | CONTRACTOR Custom # | Requirements | Type | Status | Priority |
|--------|-----|---------------|---------------------|--------------|------|--------|----------|
|        |     |               |                     |              |      |        |          |

OCB CRITICAL FUNCTIONALITY ASSESSMENT
(7 April 2010)

| Module | No. | Functionality | CONTRACTOR Custom # | Requirements | Type | Status | Priority |
|--------|-----|---------------|---------------------|--------------|------|--------|----------|
| | | | | | | | |

## OCB CRITICAL FUNCTIONALITY ASSESSMENT
### (7 April 2010)

| Module | No. | Functionality | CONTRACTOR Custom # | Requirements | Type | Status | Priority |
|--------|-----|---------------|---------------------|--------------|------|--------|----------|
| | | | | | | | |

## OCB CRITICAL FUNCTIONALITY ASSESSMENT
### (7 April 2010)

| Module | No. | Functionality | CONTRACTOR Custom # | Requirements | Type | Status | Priority |
|--------|-----|---------------|---------------------|--------------|------|--------|----------|
|        |     |               |                     |              |      |        |          |

Attachment B:

## MD50 Extension Function Specifications



| MD50 Filename | Document ID (if applicable) | Version | Author |
| --- | --- | --- | --- |
| | | 1.0 Draft 4 | |
| | | 1.0 Draft 2 | |
| | | 1.0 Draft 4 | |
| | | 1.0 Draft 2 | |
| | | 1.0 Draft 3 | |
| | | | |
| | | 1.0 Draft 1 | |
| | | 1.0 Draft 1 | |
| | | 1.0 Draft 5 | |
| | | 1.0 Draft 4 | |
| | | 1.0 Draft 4 | |
| | | 1.0 Draft 3 | |
| | | 1.0 Draft 7 | |
| | | 1.0 Draft 3 | |
| | | 1.0 Draft 3 | |

| MD50 Filename | Document ID (if applicable) | Version | Author |
|---|---|---|---|
| ███████ | ███████ | 1.0 | ███████ |
| | | 1.0 draft 2 | |
| | | | |
| | | 1.0 Draft 6 | |
| | | 1.0 Draft 5 | |
| | | 1.0 Draft 7 | |
| | | 1.0 Draft 7 | |
| | | 1.0 draft 2 | |
| | | 1.0 Draft 3 | |
| | | 1.0 Draft 1 | |
| | | 1.0 Draft 1 | |
| | | 1.0 Draft 5 | |
| | | 1.0 Draft 3 | |
| | | 1.0 draft 2 | |
| | | 1.0 Draft 1 | |
| | | 1.0 Draft 5 | |
| | | 1.0 Draft 5 | |
| | | 1.0 | |
| | | 1.0 Draft 2 | |

| MD050 Filename | Document ID (if applicable) | Version | Author |
|---|---|---|---|
| PRXL_MD050_P2090_Project_Transactions_Report.doc | | 1.0 Draft 5 | |
| | | 1.0 Draft 4 | |
| | | 1.0 Draft | |
| | | 1.0 Draft 1 | |
| | | 1.0 draft 3 | |
| | | 1.0 draft 2 | |
| | | 1.0 Draft | |
| | | 1.0 Draft | |
| | | 1.0 Draft 3 | |
| | | 1.0 Draft 3 | |
| | | 2.0 Draft 5 | |
| | | 1.0 Draft 1 | |
| | | 1.0 Draft 1 | |
| | | 1.0 Draft 1 | |
| | | 1.0 Draft 1 | |
| | | 1.0 Draft 2 | |
| | | 1.0 Draft 1 | |
| | | 1.0 Draft 1 | |
| | | 1.0 Draft 1 | |

| MD50 Filename | Document ID (if applicable) | Version | Author |
|---|---|---|---|
| ■ | ■ | 1.0 Draft 1 | ■ |
| ■ | ■ | 1.0 Draft 1 | ■ |
| ■ | ■ | 1.0 Draft 2 | ■ |
| ■ | ■ | 2.0 Draft 2 | ■ |
| ■ | ■ | 1.0 Draft 12 | ■ |
| ■ | ■ | 1.0 Draft 6 | ■ |
| ■ | ■ | 1.0 Draft 4 | ■ |
| ■ | ■ | 1.0 Draft 3 | ■ |
| ■ | ■ | 1.0 Draft 4 | ■ |
| ■ | ■ | 1.0 Draft 1 | ■ |
| ■ | ■ | 1.0 Draft 1 | ■ |
| ■ | ■ | 1.0 Draft 1 | ■ |
| ■ | ■ | 1.0 Draft 1 | ■ |
| ■ | ■ | 1.0 Draft 2 | ■ |
| ■ | ■ | 1.1 Draft 5 | ■ |
| ■ | ■ | 1.0 Draft 3 | ■ |

| MD50 Filename | Document ID (if applicable) | Version | Author |
|---|---|---|---|
| MD050_P2082-42 | | | |

## MD70 Extension Technical Specifications

| MD70 Filename | Document ID (if applicable) | Version | Author |
|---|---|---|---|
| ███ | MD70 D0██ | 1.0 Draft 3 | ███ |
| ███ | ███ | 1.0 Draft 4 | ███ |
| ███ | ███ | 1.0 Draft 7 | ███ |
| ███ | ███ | 1.0 Draft 3 | ███ |
| ███ | ███ | 1.0 Draft 4 | ███ |
| ███ | ███ | 1.0 Draft 2 | ███ |
| ███ | ███ | 1.0 Draft 1 | ███ |
| ███ | ███ | 1.0 Draft 3 | ███ |
| ███ | ███ | 1.0 Draft 3 | ███ |
| ███ | ███ | 1.0 Draft 4 | ███ |
| ███ | ███ | 1.0 Draft 4 | ███ |
| ███ | ███ | 1.0 Draft 5 | ███ |
| ███ | ███ | 1.0 Draft 2 | ███ |
| ███ | ███ | 1.0 Draft 3 | ███ |
| ███ | ███ | 1.0 Draft 3 | ███ |
| ███ | ███ | 1.0 Draft 2 | ███ |

Confidential

| MD70 Filename | Document ID (if applicable) | Version | Author |
|---|---|---|---|
| ▮ | MD070_P2088 | 1.0 Draft 1 | ▮ |
| ▮ | ▮ | 1.0 Draft 3 | ▮ |
| ▮ | ▮ | 1.0 Draft 2 | ▮ |
| ▮ | ▮ | 1.0 Draft 4 | ▮ |
| ▮ | ▮ | 1.0 Draft 3 | ▮ |
| ▮ | ▮ | 1.0 Draft 3 | ▮ |
| ▮ | ▮ | 1.0 Draft 4 | ▮ |
| ▮ | ▮ | 1.0 Draft 3 | ▮ |
| ▮ | ▮ | 1.0 Draft 4 | ▮ |
| ▮ | ▮ | 1.0 Draft 4 | ▮ |
| ▮ | ▮ | 1.0 Draft 1 | ▮ |
| ▮ | ▮ | 1.0 Draft 4 | ▮ |

Note:

Attachment C:

## BR-100 Project Application Setup Documents

| BR-100 Filename | Document ID (if applicable) | Version | Author |
|---|---|---|---|
| B■■ | BR100 Adv Col■ | 1.0 Draft 1 | ████ |
| B■■ | | 1.0 Draft 2 | |
| B■■ | | 1.0 Draft 2 | |
| J■■ | | 1.0 Draft 2 | |
| B■■ | | 1.0 Draft 2 | |
| P■■ | | 1.0 Draft 7 | |
| B■■ | | 1.0 Draft 3 | |
| B■■ | | 1.0 Draft 2 | |
| B■■ | | 1.0 Draft 2 | |
| B■■ | | 1.0 Draft 4 | |
| In■ | | 2-Mar-10 | |
| B■■ | | 15-Dec-09 | |
| B■■ | | | |

**Attachment D:**

## CV200 Conversion & Validation Specifications



| CV200 Filename | Document ID (if applicable) | Version | Author |
|---|---|---|---|
| | | 1.0 Draft 7 | |
| | | 1.0 Draft 3 | |
| | | 1.0 Draft 2 | |
| | | 1.0 Draft 2 | |
| | | 1.0 Draft 6 | |
| | | 1.0 Draft 4 | |
| | | 1.0 Draft 4 | |
| | | 1.0 Draft 7 | |
| | | 1.0 Draft 4 | |
| | | 1.0 Draft 9 | |
| | | 1.0 Draft 6 | |
| | | 1.0 Draft 2 | |
| | | 1.0 Draft 3 | |
| | | 1.0 Draft 1 | |

| CV200 Filename | Document ID (if applicable) | Version | Author |
|---|---|---|---|
| ███ | ███ | 1.0 Draft 1 | ███ |
| ███ | ███ | 1.0 Draft 3 | ███ |
| ███ | ███ | 1.0 Draft 2 | ███ |
| ███ | ███ | 1.0 Draft 3 | ███ |
| ███ | ███ | 1.0 Draft 4 | ███ |
| ███ | ███ | 1.0 Draft 1 | ███ |
| ███ | ███ | 1.0 Draft 1 | ███ |
| ███ | ███ | 1.0 Draft 1 | ███ |
| ███ | ███ | 1.0 Draft 1 | ███ |
| ███ | ███ | 1.0 Draft 1 | ███ |
| ███ | ███ | 1.0 Draft 1 | ███ |
| ███ | ███ | 1.0 Draft 1 | ███ |

Attachment E:

BR-30 Business Requirements



Attachment F:

## Key CONTRACTOR Resources

| Resource Name | Track |
| --- | --- |
| | PM |
| | Tech |
| | Tech |
| | Tech |
| | Tech |
| | GL |
| | GL |
| | GL |
| | AR |
| | AR |
| | AR |
| | AP |
| | AP |
| | Proc |
| | Proc |
| | Cap Proj |
| | Cont Proj |
| | Cont Proj |
| | Cont Proj |
| | FA |
| | AP |

# Attachment G:  Change Log

Change in Scope (CIS) Log

Oracle Costing & Billing*
Project Number:                    97317*
2TD Project Manager
PARtEKEC Project Manager*
This Section Version No. / last Updated*
CIIS executed previously*

| | | Cumulative cost | $1,500 |

See User Guide Section 2.3

| Item # | CIS Task description | Date of Request | Resource Required | Estimated Hours | Description of Expenses | Estimated Service Fees (USD) | Estimated Expensed (USD) | Total Estimated Costs | Date written approval of CIS item by PXL or date of non | Status of CIS item work | Comment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Approval | | $1,500 | $1,500 | $1,500 | Approved | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | GRAND TOTAL | | | | | $1,500 | $3,000 | $4,500 | | | |

**Attachment H:**

# CHANGE ORDER

| | |
|---|---|
| PAREXEL Project Number: | 97317 |
| Change Order Number: | |
| Change Order Date | |
| PAREXEL Project Manager: | ███████████ |

ZenSar Technologies Limited and PAREXEL International LLC signed a Scope of Work ("SOW") dated 30-March-2010. The parties wish to amend said SOW and hereby agree as follows:

1    The items listed on Change Log List, attached as Attachment 1 to this Change Order, dated <DATE> shall be incorporated in said SOW.

2    The total contract value changes as follows:

| | Previous Contract Value | Change Order Value | New Contract Value |
|---|---|---|---|
| Service Fees | | | |
| Estimated Expenses | | | |
| Total | | | |

3    The Payment Schedule shall be replaced in its entirety by the following Payment Schedule – or – <The following terms shall be added to the Payment Schedule:>

o

o

No term or condition other than the above shall be amended by this Change Order.

Accepted by

| ZenSar Technologies, Limited | PAREXEL International, LLC |
|---|---|
| Sign: | Sign: |
| Date: | Date: |
| Name: | Name: |
| Position: | Position: |

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

ZENSAR TECHNOLOGIES, INC.,          )
                                    )
            Plaintiff,              )
                                    )
                                    )
v.                                  )
                                    )
PAREXEL INTERNATIONAL LLC           )
                                    )
            Defendant.              )
------------------------------------ )

**Exhibit D**

October 28, 2010

Chakri Reddy
Associate Vice President
Zensar Technologies Limited

Re: Amendment No.1 dated April 2010 (the "Amendment") to the Statement of Work to Master Services Agreement between PAREXEL International, LLC ("PAREXEL") and Zensar Technologies Limited ("Zensar") dated 1 July 2008 ("Agreement")

Dear Chakri:

Please reference the Amendment and the Statement of Work modified hereby. While the services and deliverables stated in the Amendment have not been completed as provided therein, PAREXEL acknowledges that Zensar has made significant progress with respect to Gates I-IV. Accordingly, in recognition of this progress, PAREXEL hereby agrees to pay Zensar $2,560,000 towards the invoices already submitted to PAREXEL with respect to Gates I-IV. A copy of the invoices raised towards Gates I-IV is attached to this letter. Zensar acknowledges and agrees that such payment represents full and satisfactory payment for all work performed to date under the Amendment and Agreement with respect to Gates I-IV

With respect to the remaining work to be performed under the Amendment with respect to Gates I-IV, PAREXEL has developed a list of deficiencies and incomplete tasks ("Incomplete Tasks") attached as Exhibit A to this letter. Zensar agrees to complete and remediate the "Incomplete Tasks" as per the acceptance criteria outlined in Exhibit A. PAREXEL agrees to pay the remaining $640,000 which represent the balance amount stated in the Amendment with respect to Gates I-IV upon Zensar completing the "Incomplete Tasks" as indicated in Exhibit A.

With respect to change order # 11 dated 31ˢᵗ August, 2010 signed between Zensar and PAREXEL, Zensar has delivered and completed all services mentioned in the said change order. Accordingly PAREXEL will pay Zensar $ 85,305 in full payment and satisfaction of the services and deliverables of the said change order within 60 days of receipt of a proper invoice from Zensar.

Also as per the change order request dated August 30ᵗʰ 2010 signed between PAREXEL and Zensar, upon Zensar's proper completion of the deliverables of the change order and subsequent proper invoice submission, PAREXEL agrees to pay $ 78,200 in full payment and satisfaction for such services and deliverables (including 440 hours of onsite support from August 30, 2010 to October 29, 2010).

Nothing herein is intended nor should it be construed to reflect any legal or factual position, waiver, estoppel, or other argument(s) as it may relate to Gate V (Quality Incentive). In this respect, both PAREXEL and Zensar reserve any and all respective rights, positions and/or obligations relating to Gate V Deliverables.

If the foregoing is acceptable to you, please indicate your binding agreement thereto by having an authorized representative sign on behalf of Zensar in the space provided below.

Agreed and Accepted:

Zensar Technologies Limited

Chakri Reddy

Very truly yours,

Gerald N. Herman

October 5, 2010
ZTD Critical Functionality Assessment

| Procurement: | ZTD | PXL | Status |
|---|---|---|---|
| 1. Auto Receipt: duplicate receipts | X | | Open |
| 2. PO Accrual: process issue | | X | Open |
| 3. Workflow Mailer | | X | Open |
| 4. Vacation Rules: custom broke std functionality | X | | Fixed |
| 5. Workflow: problem with terminated employees | X | | Open |
| 6. Escalation: 3 Business vs Calendar Days | X | | Fixed |
| 7. Workflow visibility: std functionality not working | X | | Open |
| 8. PO Hold (AP invoice processing to receipt) | X | | |

| Billing: | | | |
|---|---|---|---|
| 1. PT Invoice Details Backup Report (Characters will not all print; Can only print one invoice at a time. Very slow) | X | | Open |
| 2. Intercompany Report | X | | Fixed |
| 3. CSL for non-Oracle entities (PT 100580) | X | | Open |
| 4. Draft Invoice Report (PT 100158) | X | | Open |

| Projects: | | | |
|---|---|---|---|
| 1. Advance Adjustment (PT 102312) | X | | Open |
| 2. PXL Milestone Upload Interface (PT 102238) | X | | Open |
| 3. PRXL Generate Draft Revenue Program for range (PT100500) | X | | Open |

| Performance: | | | |
|---|---|---|---|
| 1. Custom code has not been reviewed for optimizations. Current top mal-performers are: | | | |
|    a. [ Redacted ] | X | | Open |
|    b. | X | | Open |
|    c. | X | | Open |
| 2. Quality of work with regards to following standards | | | |
|    a. Issue with quality of work with regards to standards requires several months to identify and correct | X | | Open |

## GL/AGIS

1. Lack of Intercompany Reports causing manual work
2. Drew was retained to help deal with AGIS/GL issues

of the Incomplete Tasks will be delivered and accepted by November 30, 2010 and PAREXEL shall have no obligation to pay for any deficient Incomplete Tasks or Incomplete Tasks not accepted by such date and shall have the right thereafter to address any deficient Tasks as it shall determine in its sole discretion.

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ZENSAR TECHNOLOGIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| PAREXEL INTERNATIONAL LLC | ) |
| | ) |
| Defendant. | ) |
| ---------------------------------------------------- | ) |

**Exhibit E**

**Acceptance Criteria**

Upon completion of each of the above "Incomplete Tasks", Zensar will demonstrate to PAREXEL the functionality of the Deliverable associated with the incomplete task. PAREXEL shall be responsible for any additional review and testing of such Deliverable in accordance with any applicable acceptance criteria and test suites. If a submitted Deliverable does not perform according to the functional requirements specified for such Deliverable in the Amendment No.1 and the acceptance test developed by PAREXEL, PAREXEL shall have ten (10) business days after Zensar's submission of the Deliverable ("Acceptance Period") to give written (including email) notice thereof to Zensar specifying the deficiencies in detail. Zensar shall cure any such deficiencies and resubmit the deliverable for acceptance testing pursuant to the aforementioned procedure. If the deliverable continues to display deficiencies, PAREXEL shall have the right to reject the deliverable and to make an equitable adjustment against the amount specified for the Incomplete Tasks. If PAREXEL fails to notify Zensar any Deliverable within the Acceptance Period in the manner described above, such Deliverable shall be deemed Accepted by PAREXEL at the end of the Acceptance Period. All of the Incomplete Tasks will be delivered and accepted by November 30, 2010 and PAREXEL shall have no obligation to pay for any deficient Incomplete Tasks or Incomplete Tasks not accepted by such date and shall have the right thereafter to address any deficient Tasks as it shall determine in its sole discretion.

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS**

ZENSAR TECHNOLOGIES, INC.,    )
                             )
         Plaintiff,            )
                             )
                             )
v.                                )
                             )
PAREXEL INTERNATIONAL LLC    )
                             )
         Defendant.        )
----------------------------------------------------- )

**Exhibit F**

**Jon D. Cohen**

| | |
|---|---|
| **From:** | Tripurani, Chandra |
| **Sent:** | Saturday, November 20, 2010 12:03 PM |
| **To:** | Kiezulas, Chris |
| **Cc:** | Herman, Gerald; Chakravardhan Vaddi; Joseph Ung |
| **Subject:** | Zensar Tasks Status - ALL ISSES RESOLVED |
| **Importance:** | High |
| **Attachments:** | Parexel - Zensar Pending Item List Status 11202010.xlsx |



Parexel - Zensar
Pending Item ...

Hi Chris,

The remaining pending items - two project tasks were validated and confirmed by Srini, two performance tasks were also validated in PRE3 instance and performance improved significantly.

Please find the attached status of all tasks. All of them are resolved.

Thanks
Chandra.

Parexel - Pending Items List

| Issue # | Track | Issue Description | Issue Type | Owner | Status | Comments |
|---|---|---|---|---|---|---|
| 1 | | Auto Receipt: Duplicate Receipts | Standard Functionality | Vikas | Closed | Julie confirmed that issue has been resolved. |
| 2 | Procurement | Workflow : Problem with terminated employees | Custom Workflow | Preeti / Gayathri | Closed | Provided solution to handle terminated employees, it was developed and tested as well. Parexel is performing additional changes to same workflow at this point. This has been discussed with Julie and Chris. |
| 3 | | Workflow Visibility: Std functionality not working | Custom Workflow | Preeti / Gayathri | Closed | Discussed and confirmed with Julie that this was known from the beginning, a report is available to view approval flow. |
| 4 | | PO Hold (AP Invoice Processing to receipt) | Standard Functionality | Vikas | Closed | Vikas checked with Julie and Sandra. This is more process related issue, system is functioning fine. |
| 5 | Billing | PT Invoice details backup report (Characters will not all print;Can only print one invoice at a time. Very slow) | Custom Report | Preeti / Gayathri | Closed | This issue is related to Printer. Jeannine/Bryan's team are working with HP/Oracle to fix these. |
| 6 | | Intercompany Report | Custom Report | Preeti / Gayathri | Closed | Provided requested details, Alger asked Zemar not to make any changes and Parexel IT team is making changes. |
| 7 | | CSL for non-Oracle entities(PT 100580) | Custom Report | Preeti / Gayathri | Closed | This report was developed by Parexel, not by Zemar team |
| 8 | | Draft Invoice Report(PT 100158) | Custom Report | Preeti / Gayathri | Closed | This report was developed by Parexel, not by Zemar team |
| 9 | Projects | Advance Adjustment (PT 102312) | Custom Process | Preeti / Gayathri | Closed | Reported precision calculation bug fixed, Srini validated and confirmed. |
| 10 | | PXL Milestone Upload Interface (PT 102238) | Custom Process | Preeti / Gayathri | Closed | Bug is fixed, Srini validated and confirmed. |
| 11 | | PRXL Generate Draft Revenue Program for range (PT100500) | Custom Process | Preeti / Gayathri | Closed | Bug is fixed, Srini validated and confirmed. |
| 12 | Performance | Custom code has not been reviewed for optimizations. Current top mal-performers are: a. PR██ b. PR██ c. PR██ | Custom Program | Preeti / Gayathri | Closed | a. Fine tuned program and performance improved significantly. b. Fine tuned program and performance improved significantly. C. PRXL interface. |
| 13 | | Quality of work with regards to standards a. Issues with quality of work with regards to standards | Custom Program | Preeti / Gayathri | Closed | Have not heard any other performance issues |